**UNITED STATES of America,
Plaintiff,**

v.

**Roy Lee WILLIAMS, Defendant.**

**No. 74 CR 47–W–1.**

United States District Court,
W. D. Missouri, W. D.

Oct. 21, 1974.

On Motion for Reconsideration
Nov. 15, 1974.

Indictment Dismissed Dec. 3, 1974.

See also D.C., 378 F.Supp. 61.

Bert C. Hurn, U. S. Atty., Michael A. DeFeo, Chief, Strike Force, Kurt P. Schulke, Special Atty., Dept. of Justice, Kansas City, Mo., for plaintiff.

Thomas A. Wadden, Jr., Washington, D. C., James G. Walsh, Jr., Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER GRANTING TWO OF DEFENDANT'S PENDING MOTIONS

JOHN W. OLIVER, District Judge.

### I.

Our memorandum opinion of July 11, 1974 reflects that at that time there were four pending motions which had then been filed by the defendant. The orders entered that day were in anticipation of a Rule 17.1 pretrial conference and an evidentiary hearing scheduled for July 22, 1974. The files and records, together with the transcript of proceedings held on July 22, 23 and 24, 1974, show that in addition to the four motions which pended at that time, the following additional motions also pend: (1) defendant's motion to dismiss the indictment because the United States Attorneys who procured same lacked proper authority to act, filed July 23, 1974; (2) defendant's motion to dismiss the indictment on the ground that the Department of Justice lacks jurisdiction, filed July 23, 1974; (3) defendant's motion for bill of particulars, filed September 5, 1974; (4) defendant's supplemental motion for discovery and inspection, filed September 5, 1974; and (5) defendant's motion for an order to show cause why the indictment should not be dismissed, filed October 3, 1974.

The Court has carefully considered the suggestions in support and in opposition to all the pending motions. It has also carefully considered the stipulation of facts agreed to by the parties and the virtually undisputed factual circumstances developed by the testimony and exhibits admitted in evidence at the hearing. We have also conducted independent research in connection with the important and substantial questions presented by various of the pending motions. Because of the refusal of the government voluntarily to submit relevant and material data for *in camera* inspection by the Court, we have con-

cluded that defendant's motion for bill of particulars and defendant's supplemental motion for discovery and inspection, both filed September 5, 1974, must be ruled at this time in order that the Court have the benefit of all relevant data before it when the other motions are ruled and in order that the defendant be properly advised of all material evidentiary data which has been reasonably requested, to which he may be entitled as a matter of due process.

## II.

■ Defendant's motion for bill of particulars, filed pursuant to Rule 7(f), was carefully drawn in light of matters developed at the hearing. We have recently reiterated our views in regard to the bills of particulars in United States v. Barket, 380 F.Supp. 1018, decided August 29, 1974. It is therefore unnecessary to again point out the reasons why the cases traditionally relied upon by the government are not applicable to the case at bar.

We find and conclude that defendant is entitled to a bill of particulars in regard to each numbered paragraph of his motion except paragraphs 5, 6, and 7.

The notion that the government may refuse to produce the data sought because such data has not been published in the Federal Register, a notion upon which the government also relies in opposing defendant's supplemental motion for discovery and inspection, is untenable. See Judge William J. Campbell's opinion in United States v. Leichtfuss, (N.D.Ill.1971), 331 F.Supp. 723, 730, and 738. Compare Will v. United States, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967).

We shall therefore enter an order granting defendant's motion for a bill of particulars in regard to paragraphs 1, 2, 3, and 4.

## III.

■ Defendant's supplemental motion for discovery and inspection was also drawn in light of the position taken by the government at the hearing. That position, incidentally, was in sharp contrast with the position recently taken by the Antitrust Division of the Department of Justice in United States v. AMPI, and in the Midwest Milk Monopolization Litigation, JPMDL Docket #83, which pend in this Court.

That position, however, was consistent with the position initially taken by the Secretary of Agriculture in the milk litigation. Principles articulated and applied in connection with the Secretary of Agriculture's initial position were implicitly approved in United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). The question presented in United States v. Nixon, of course, related to the power of discovery pursuant to Rule 17(c), rather than Rule 16(b), involved in this case. United States v. Nixon is also procedurally distinguishable from this case because the government in this case, like the Secretary of Agriculture in the Midwest Milk Monopolization Litigation, insists, for reasons neither stated nor apparent, that its ultimate position in regard to making any claim of privilege recognized by law must be delayed to the last possible moment.

That adamant position is maintained in the face of this Court's assurance, which it now reiterates, that it would not under any circumstance deliver any data produced by the government for *in camera* inspection to the defendant, defendant's counsel, or to anyone else, until the government was afforded a reasonable period of time to seek appropriate appellate review from any order directing delivery of any data under the circumstances. Such a procedure is supported, contrary to the government's opposing argument, by the recent opinion in the Second Circuit in United States v. Berrios, 501 F.2d 1207, decided August 8, 1974.

When Rule 16 was amended in 1966, paragraph (b) of the new rule as it re-

lated to the discovery of "books, papers, documents, tangible objects, buildings or places" was borrowed from the similar and earlier language of Rule 17(c) which had long vested power to obtain "books, papers, documents or other objects" by subpoena. Rule 17(c), when earlier promulgated, of course, used language substantially the same as Rule 45(c) of the Rules of Civil Procedure.

Rule 16(b), however, was promulgated after Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), had been decided. The government's suggestions in this case are quite typical of the suggestions which the government has filed in other cases in which it has resisted discovery under Rule 16(b). Those suggestions either totally ignore, or fail adequately to treat with, the real danger of reversals based upon the government's apparent desire to conceal evidence which an appellate court might conclude was favorable to an accused which should have been produced under due process requirements, as articulated in *Brady*. We are therefore not impressed with the cases, particularly district court decisions, which apparently consider that Rule 16(b) motions do not involve additional and imperative constitutional considerations. We believe Professor Wright in Federal Practice and Procedure, Section 254, p. 514, correctly states that:

> In passing on a Rule 16(b) motion, there are constitutional imperatives that cannot be disregarded. In a famous and controversial passage, the Supreme Court said: "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." [quoting from Brady v. State of Maryland, (1963) 373 U.S. 83, 104, 83 S.Ct. 1194, 10 L.Ed.2d 215.] . . . Since Rule 16(b) clearly permits discovery more

broadly than due process requires, in doubtful cases courts should grant discovery sought under the rule and thus avoid the constitutional question. Liberality in passing on discovery motions under this rule also would be consistent with the Supreme Court's recognition that "disclosure, rather suppression, of relevant materials ordinarily promotes the proper administration of criminal justice." [quoted from Dennis v. United States, (1966) 384 U.S. 855, 869, 86 S.Ct. 1840, 16 L.Ed.2d 973].

Accordingly, under Rule 16(b), we find and conclude in light of all the evidentiary data presently before the Court and in light of the applicable law discussed in the suggestions in support and in opposition to defendant's pending motions, supplemented by our own independent research, that the data sought by defendant's supplemental motion for discovery and inspection is relevant and material to the questions presented in those motions and that defendant's requests under the particular circumstances of this case are reasonable.

Whether the material may or may not relate to "reports, memoranda, or other internal government documents made by government agents in connection with the investigation or prosecution of this case," within the proper meaning of Rule 16(b) may not properly be determined without an *in camera* inspection of the data.

Alternatively, and as an independent ground, we find and conclude that the material sought by defendant's pending motion for discovery could, under the circumstances of this case, be reasonably expected to reveal evidence favorable to the defendant, the continued suppression of which may be a violation of constitutional principles articulated in Brady v. Maryland. Again, whether this may or not be true can not properly be determined without an *in camera* inspection of the data sought. Defendant's motion

will be granted for both the reasons stated.

## IV.

For the reasons stated, it is

Ordered (1) that defendant's motion for a bill of particulars should be and the same is hereby granted to the extent hereinafter indicated. The government shall within fifteen (15) days of this order prepare, serve, and file an appropriate bill of particulars which shall furnish the information requested in paragraphs 1, 2, 3, and 4 of defendant's motion for a bill of particulars filed September 5, 1974. It is further

Ordered (2) that defendant's supplemental motion for discovery and inspection filed September 5, 1974 should be and the same is hereby granted. The government shall within fifteen (15) days of this order prepare and file for *in camera* inspection by this Court an appropriate response to which it shall attach as exhibits the material requested in each separately numbered paragraph of defendant's motion. The exhibits attached shall be numbered and keyed to those paragraphs. If no such material is in existence, the government shall so state in its response. It is further

Ordered (3) that after the Court has conducted an appropriate *in camera* inspection of the government's response and of the exhibits attached thereto, it will enter an order indicating what data, if any, it may find and conclude should be delivered to the defendant and his counsel. Any order which may be entered under the circumstances will not disclose the data produced nor will such data ever be disclosed by this Court until the government is afforded a reasonable opportunity to seek appellate review under the circumstances.

In the event such a review is sought, in accordance with the procedure approved in United States v. Berrios, *supra*, this Court will seal and retain all data produced by the government so that it will be available for transmittal to the Court of Appeals.

## ON MOTION FOR RECONSIDERATION OF ORDERS ENTERED OCTOBER 21, 1974

### I.

For the second time within the last two years, we are required to face a possible refusal on the part of the Executive branch of the government to comply with a discovery order entered by this Court. The possibility of such a refusal has the potential of provoking a serious confrontation between the Judicial and Executive branches of our government. The inability of the persons involved in United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), to reach a lawful accommodation, as recommended by Chief Justice Marshall in the trial of Aaron Burr, forced the confrontation and the Supreme Court's consideration and the determination of that recent case. We have stated in earlier cases and now reiterate our agreement with Chief Justice Marshall's wisdom. See memorandum opinions and orders entered May 23, 1973 and July 31, 1973 in the Midwest Milk Monopolization Litigation, JPML Docket No. 83, 60 F.R.D. 12, 15, and 21 (W.D.Mo.1973). We write this opinion in order to give the Executive branch an appropriate opportunity to reconsider the implications of the position it has tentatively indicated it may take in this case.

This Court was able to avoid confrontation in regard to its discovery order entered last year in the *Midwest Milk Monopolization Litigation*, which directed *in camera* production by the Secretary of Agriculture. Eventual compliance with the order for *in camera* production by the Secretary of Agriculture avoided the confrontation which otherwise would have been inevitable. We shall follow the same procedures in this case in the hope that the govern-

ment, upon reconsideration, will reach the same conclusion.[1]

Consistent with prior practice in regard to the highly sensitive question which may be presented, we shall set forth in detail the circumstances relating to the October 21, 1974 orders entered by this Court which (1) required the government to file a bill of particulars and which (2) directed the government to produce particular material for this Court's *in camera* inspection. We shall detail the government's insufficient compliance with the order directing that it file a bill of particulars and shall set forth the insufficient reasons on which the government has indicated that it may refuse to comply with our order directing *in camera* production.

We shall then discuss the applicable legal authorities, concentrating primarily on those upon which the government has attempted to rely, which establish that this case presents important and substantial questions which directly relate to the manner in which the Attorney General of the United States has construed and purported to exercise the power conferred on him by the Act of June 30, 1906, ch. 3935, 34 Stat. 816, presently codified as Section 515(a), Title 28, United States Code, to "specially appoint" and to "specifically direct" Special Attorneys to conduct criminal proceedings in the Western District of Missouri.[2]

We hope that what will·be said will make it obvious to the highest executive authorities in Washington that the questions presented in this case are not going to go away. For it would seem to be clear that if the power vested in the Attorney General by the Act of June 30, 1906, as presently codified as Section 515(a), (1) has not been properly exercised by the Attorney General in regard particularly to Mr. Schulke, or (2) if that statute, properly construed, is not broad enough to authorize the action which the Attorney General has, in fact, attempted to take pursuant to its authority, either possibility should be recognized and determined at the earliest possible moment so that any administrative defects in regard to the Attorney General's present method of special appointment and specific direction of Special Attorneys be corrected or that additional Congressional authorization be sought and obtained under the circumstances.[3]

1. In another phase of the *Midwest Milk Monopolization Litigation*, the necessity for the entry of an order for *in camera* production of intra-departmental memoranda and other unpublished data of the Department of Justice and the possibility of Executive and Judicial branch confrontation was avoided by the commendable voluntary production *in camera* of that material by the Antitrust Division of the Department of Justice. The United States Attorney for this district, as recently as November 5, 1974, in the case of United States v. Barket, Nos. 74 CR 141–W–1 and 74 CR 168–W–1, has commendably indicated that the possibility of confrontation will be avoided in that case by a similar voluntary *in camera* production, which, incidentally, will be made with the approval of the Department of Justice in Washington.

2. The proceedings thus far conducted in this case suggest that the Attorney General, by his establishment of a network of various Department of Justice "field offices" throughout the United States, may have attempted to delegate and thereby exercise the power of special appointment and specific direction conferred on him by present Section 515(a) in substantially the same manner in many other of the judicial districts of the United States.

3. See United States v. Goldman (D.Conn. 1928), 28 F.2d 424 at 427, one of·the cases which reflected the conflict in authority (eventually resolved by the promulgation of Rule 6, F.R.Cr.P.) as to whether the Act of June 30, 1906, was broad enough to authorize the appointment of an attorney to serve a grand jury as a shorthand stenographer. After concluding that the Act was not broad enough to do so, the court stated that "the remedy lies with the Congress, [for] it is not for the courts to extend the plain intendment of the Act of June 30, 1906, beyond what is contemplated within the provisions of the act." ·

We believe it fortunate that the government has not yet taken an adamant stand in regard to its refusal to make the *in camera* production ordered in this case. In this case, as was also true in the earlier case involving the Secretary of Agriculture's tentative refusal to comply with the discovery order entered in the *Midwest Milk Monopolization Litigation,* the government has elected to attempt to postpone the time when it will be required to state a definite position.

The government rationalizes its tentative refusal to produce for *in camera* inspection material which this Court has determined may be relevant and material evidence which may be favorable to the defendant, the continued suppression of which could be a violation of constitutional principles articulated in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and other applicable law, by stating that "The discovery directed and contemplated by the Court would involve disclosure of sources of sensitive information and tactical and strategic discussion concerning law enforcement activity against organized criminal activities. Such disclosure, whether to the Court or defense counsel, is inconsistent with the degree of professional discretion and confidence necessary to successful law enforcement efforts against organized crime."

Apart from being an implicit statement of distrust of the federal judiciary, it should be apparent that vague statements and rhetorical claims about "organized crime," a term which the Congress has yet to define, have no greater standing in law than the not dissimilar broad and vague claims made to resist the *in camera* production ordered in United States v. Nixon, *supra.*

In United States v. Nixon, Chief Justice Burger's unanimous opinion concluded that "Absent a claim of need to protect military, diplomatic or sensitive national security secrets, we find it difficult to accept the argument that even the very important interest in confidentiality of presidential communications is significantly diminished by production of such material for *in camera* inspection with all the protection that a district court will be obliged to provide." [418 U.S. 706, 94 S.Ct. 3107] In this case, the government has stated of record that no military, diplomatic, or national security secrets are involved.

Based fundamentally on Chief Justice Marshall's holding in Marbury v. Madison, 1 Cranch 137, 177, 2 L.Ed. 60 (1803), that "it is emphatically the province and duty of the judicial department to say what the law is," the Supreme Court determined in United States v. Nixon that:

> We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

> \* \* \* \* \* \*

> We conclude that when the ground for asserting privilege as to subpoenaed materials sought for use in a criminal trial is based only on the generalized interest in confidentiality, it cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice. [418 U.S. 709, 713, 94 S.Ct. 3108, 3110]

Government counsel in this case and their superiors in Washington must

come to understand that they do not have a monopoly on opposition to what may be labeled as "organized crime." This Court, as every other court in the Nation, is opposed to all crime, including that which may be labeled "organized." The notion that courts may properly be accused of being in favor of "organized crime" because they must, in the proper exercise of their duties, apply the Constitution and laws of the United States with equal force to all cases, whether or not a particular case may have been labeled an "organized crime" case, is total nonsense. Senator McClellan, one of the principal sponsors of what is labeled the "Organized Crime and Safe Streets Act of 1970," has properly stated that "the Constitution applies to those engaged in organized crime, just as it applies to those engaged in white-collar or street crime." 46 Notre Dame Lawyer 57, 62 (1970). In the same Notre Dame Lawyer article, which Senator McClellan placed in the Congressional Record (119 Cong.Rec. 5562), he stated that the words "organized crime" were not used to define "a precise and operative legal concept" but were used only as "a shorthand method of referring to a large and varying group of offenses committed in diverse circumstances" [Ibid. at 61].

 The point just discussed is related to an apparent unhappiness on the part of government counsel with the circumstances under which the questions presented in this case came into focus. In one of their briefs, for example, government counsel implicitly complain that "the Court, *sua sponte,* questioned the authority of the Government attorneys" (page 1 of the Government's memorandum of law concerning authority of attorneys for the United States to appear in the Western District of Missouri). United States v. Kilpatrick (W.D.N.Car. 1883), 16 F. 765, 773, properly restated the ancient and applicable rule that "It is the duty of a court to look into what is brought to its attention outside the indictment, and even outside the record, in a cause, to see that a prosecution is properly instituted." That principle is particularly applicable to cases involving questions relating to the grand jury. For the cases decided in that area of the law clearly establish what prosecuting attorneys are sometimes prone to forget, as United States v. Kilpatrick, properly stated, that "the grand jury . . . has always been . . . considered as a safeguard of the liberties of the people against the encroachments and oppressions of political power, and against unfounded accusations prompted by private malice, personal animosity, or other improper motives" [Ibid. at 768].[4]

We turn now to the government's request that we reconsider the order entered October 21, 1974 requiring production.

## II.

In its effort to postpone a definite decision as to whether it will or will not comply with this Court's order for *in camera* production, the government has requested that we reconsider our October 21, 1974 order and thus avoid what the government calls the "unfortunate and unnecessary result" of dismissal of the pending prosecution. We are further advised that "Government counsel have been directed by their

4. The government's attempted reliance on Sullivan v. United States, 348 U.S. 170, 75 S.Ct. 182, 99 L.Ed. 210 (1954), to support its tentative refusal to produce reflects its apparent inability to understand that questions relating to the institution of the prosecution and to the integrity of grand jury proceedings are presented in this case. It is clear that in *Sullivan,* a duly appointed and qualified United States Attorney presented the evidence to the grand jury. The fact that the Attorney General's office in Washington did not direct the District Attorney to do so was held not to be a proper ground for granting the defendant's motion to withdraw his plea of *nolle contendere. Sullivan* involved no more and no less.

superiors in the Criminal Division of the Department of Justice to respectfully decline to produce the requested materials and if necessary to suffer dismissal of the instant prosecution rather than breach that essential confidentiality." [5]

We quite agree with the suggestion that the questions presented in this case warrant careful reconsideration on the part of all persons who play a responsible part in what may develop into a direct confrontation of two separate branches of our government. We have again read and again considered all the briefs which have been filed by the parties. We have conducted still further independent research in regard to the most serious questions presented. On the basis of that careful reconsideration we find and conclude that our order of October 21, 1974 should not be changed or modified in any substantial regard. We believe, however, consistent with effective procedures directed last year in regard to the Secretary of Agriculture, that we should modify the time schedule provided in the order to produce to afford government's counsel's "superiors in the Criminal Division of the Department of Justice" in Washington an appropriate opportunity to reconsider the directions which they have apparently given in this case.

We are hopeful that government counsel's superiors in Washington will reconsider their directions that the government refuse to comply with an order of this Court. It would seem clear that if the government believes that the order of October 21, 1974 requiring *in camera* production is not in accord with the Constitution and laws of the United States, rather than directing disobedience, it would immediately seek appropriate appellate review of that order. See Will v. United States, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967), for appropriate available procedures.

We have already stated that we would stay the execution of any order which might be made after *in camera* inspection of the material produced, pending any appropriate review which the government might wish to seek under the circumstances. We make the same statement in regard to the October 21, 1974 order.

We would be hopeful that an appropriate reconsideration of the directions given by government counsel's superiors in Washington would include an appropriate recognition of the fact that present directions "to suffer dismissal" in this particular case, rather than directions to either comply or seek appropriate appellate review, will not make the serious questions presented in this case go away. Indeed, the whole question of whether the government will be permitted "to suffer dismissal" is within the discretionary control of this Court, not the government. See Rule 48(a), F.R.Cr.P., and United States v. Becker (W.D.Mo.1963), 221 F.Supp. 950.

Should dismissal of the pending case be permitted, it would mean only that the questions presented in regard to the authority of Special Attorneys to appear before a Western District of Missouri grand jury would not be decided in this particular case. We believe that it should be quite apparent, however, that the same questions would likely be presented in a very short period of time in either pending or future cases in which the granting of an appropriate motion under Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Dennis v. United States, 384 U.S.

---

5. The words "that essential confidentiality" in the government's quoted statement refer back to a next preceding sentence which contends without supporting citation of legal authority, that "Any request for purely internal memoranda of the Department of Justice calls for factual and legal analysis, recommendations, conclusion and advice which in the Government's view cannot be disclosed without serious injury to the legitimate interest of confidentiality in law enforcement and the exercise of prosecutive discretion."

855, 869, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), reveals that some Special Attorney in the Kansas City "field office" of the Department of Justice did, in fact, appear before and assist in the conduct of grand jury proceedings in the Western District of Missouri.

It is doubtful whether the questions presented in this case could successfully be presented by way of a Section 2255 motion or some other post-conviction motion or proceeding. For Rule 12(b)(2), F.R.Cr.P., provides that among the "defenses and objections" which *must*, rather than *may*, be raised by "motion before trial" are included those "based on defects in the institution of the prosecution." The Notes of the Advisory Committee state that this language of Rule 12(b)(2) was intended to include defenses and objections based on the "presence of unauthorized persons in the grand jury room" in that group of defenses and objections. Shotwell Mfg. Co. v. United States, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963), and Davis v. United States, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1963), both establish that the explicit waiver provision of Rule 12(b)(2) which provides that "Failure to present any such defense or objection [by motion before trial] constitutes a waiver thereof . .," means exactly what it says. The remainder of that sentence in Rule 12(b)(2), of course, also provides that "the court for cause shown may grant relief from the waiver." But, as the Supreme Court's decision of Rule 12(b)(2) in the cited cases shows, it would be a most exceptional case in which a defendant might be able to establish an appropriate factual basis to support the exercise of discretionary power to grant relief from the express waiver provision of Rule 12(b)(2) under circumstances where it is made apparent that

the facts concerning the presence of an allegedly unauthorized person before a grand jury were or could have been made available to the defendant by the exercise of due diligence before trial.[6]

The hoped-for reconsideration should nevertheless take into account Judge Pettine's action in United States v. Gramolini (D.R.I.1969), 301 F.Supp. 39, 42, in another case involving proceedings before a federal grand jury. That case involved the question of whether the proper administration of federal criminal justice requires all proceedings before a grand jury to be transcribed or otherwise equally effectively recorded. Exercising power under Rule 57(a), Judge Pettine concluded that they must be. While the court refused to grant the defendant's motion to dismiss the indictment in the case in which the question was first presented, it stated: "The United States Attorney is hereby on notice that every indictment handed down subsequent to the effective date of this decision is vulnerable if grand jury proceedings in obtaining those indictments are not transcribed or otherwise equally effectively recorded."

We trust that the government's reconsideration of its tentatively stated position will give appropriate consideration to the fact that directions to "suffer dismissal" of the pending case cannot moot the questions which relate to the power and authority vested by the Congress in the Attorney General by the Act of June 30, 1906, and the manner in which the Attorney General has attempted to exercise that power.

Quite frankly, we cannot understand why government counsel's superiors in Washington would want to keep secret the manner in which the Attorney General has exercised power under Section 515(a) or to attempt to delay or

---

6. We need not, and therefore do not reach that question because this case involves timely motions filed before trial. Nor do we reach the related question of whether the most recent case of Davis v. United States, *supra*, may have placed distinct limitations on Rule 12(b)(2)'s apparent grant of discretionary power to grant relief from waiver. That question will be decided when and if it is presented in some future case.

postpone a definite final judicial determination of the questions presented in this case.

If proper guidelines relating to the delegation and exercise of power conferred on the Attorney General by present Section 515(a) have, in fact, been promulgated and properly followed, it would seem that the government would want to have those circumstances publicly known and promptly established so that the Attorney General's exercise of power, if proper, may be judicially approved. We know of no other way any possible cloud may be removed in regard to the numerous prosecutions which may be maintained in the future by Special Attorneys operating out of various Department of Justice "field offices" throughout the country.[7]

If, on the other hand, contrary circumstances exist in regard to the manner in which the Attorney General has exercised the power conferred upon him by the Congress, it would seem apparent that appropriate recognition should be given the facts as they may exist and proper steps to cure any possible deficiencies should be immediately undertaken in the interest of justice.

If there is reasonable doubt about the extent of power conferred by the Act of June 30, 1906, or if there may be reasonable doubt whether such power may have been properly exercised in this case, we believe that appropriate consideration should be given to designing further procedures which would convert this case into a test case in order that all possible doubts about the authority of Section 515(a) Special Attorneys to act in the Western District of Missouri be judicially resolved under the circumstances.

We turn now to the particular circumstances which have thus far been determined by the stipulations of the parties and testimony adduced at the plenary evidentiary hearing held July 22, 23, 24, and 25, 1974, in connection with various pending motions.

### III.

On October 21, 1974, for reasons stated in our memorandum opinion filed that day, we entered separate orders which (1) granted defendant's motion for a bill of particulars in regard to paragraphs 1, 2, 3, and 4 thereof, and (2) granted defendant's supplemental motion for discovery and inspection.

On November 4, 1974, the government filed an uninformative bill of particulars in which it represented that it could not state whether former Deputy Attorney General Kleindienst did or did not personally sign Exhibit 2, which purported to be Mr. DeFeo's letter of appointment as a Special Attorney, for the alleged reason that "Mr. Kleindienst has left the Department of Justice." The same representation was made in regard to whether Mr. Kleindienst in his capacity as Acting Attorney General had actually signed Exhibit 6, Mr. Schulke's similar letter of appointment.

Exhibit 2, a letter addressed to Mr. DeFeo, dated March 3, 1971, apparently signed by Deputy Attorney General Kleindienst, and apparently written under authority conferred by the Act of June 30, 1906, presently codified as Section 515(a), Title 28, United States Code, written on the letterhead of the "Office of the Deputy Attorney General, Washington D. C. 20530," stated the following:

Mr. Micheal A. DeFeo
Criminal Division
Department of Justice
Washington, D.C.

---

7. The government has conceded in this case that the publicity in the public media in which the Special Attorneys assigned by Washington to the network of Department of Justice "field offices" are referred to as a "Strike Force" is the product of a Department of Justice public relations officer. The government concedes that the Congress has not expressly authorized the creation of either a Department of Justice "field office" or a "Strike Force" to operate anywhere in the United States.

Dear Mr. DeFeo:

As an attorney and counselor at law you are hereby specially retained and appointed as a Special Attorney under the authority of the Department of Justice to assist in the trial of the case or cases growing out of the transactions hereinafter mentioned in which the Government is interested. In that connection you are specifically directed to file informations and to conduct in the Western District of Missouri and in any other judicial district where the jurisdiction thereof lies any kind of legal proceedings, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which United States Attorneys are authorized by law to conduct.

The Department is informed that various persons, companies, corporations, firms, associations, and organizations to the Department unknown have violated in the above-named district and in other judicial districts the laws relating to extortion in aid of racketeering (18 U.S.C. 1951), embezzlement of union funds (29 U.S.C. 501(c)), and the funds of welfare and pension plans (18 U.S.C. 664), payments by employers to their employees and to officials of labor organizations (29 U.S.C. 186), the filing of reports and the maintenance of records by unions and union officials (29 U.S.C. 439), deprivation of the rights of a union member by force (29 U.S.C. 530), obstruction of justice (18 U.S.C. 1503), obstruction of criminal investigations (18 U.S.C. 1510), obstruction of state or local law enforcement (18 U.S.C. 1511), travel and transportation in aid of racketeering (18 U.S.C. 1952), transmission of bets, wagers, and related information by wire communications (18 U.S.C. 1084), interstate transportation of wagering paraphernalia (18 U.S.C. 1953), prohibition of illegal gambling businesses (18 U.S.C. 1955), racketeer influenced and corrupt organizations (18 U.S.

C. 1962), perjury (18 U.S.C. 1621), false declarations (18 U.S.C. 1623), mail fraud (18 U.S.C. 1341), fraud by wire (18 U.S.C. 1343), interstate transportation of stolen property (18 U.S.C. 2314), wire and radio communication (47 U.S.C. 203 and 501), internal revenue (26 U.S.C. 7201–7206), and other criminal laws of the United States and have conspired to commit all such offenses in violation of Section 371 of Title 18 of the United States Code.

You are to serve without compensation other than the compensation you are now receiving under existing appointment.

Please execute the required oath of office and forward a duplicate thereof to the Criminal Division, Department of Justice.

> Sincerely,
>
> /S/ Richard G. Kleindienst
>
> Richard G. Kleindienst
>
> Deputy Attorney General

Exhibit 3, Mr. DeFeo's oath of office, is required by present Section 515(b), Title 28, U.S.C. That oath, written on "Form No. DJ–16 (Rev. 12–12–56)", obligated Mr. DeFeo to support and defend the Constitution of the United States, to bear true faith and allegiance to the same, and to well and faithfully discharge his duties of the office of:

Special Attorney under letter of appointment dated March 3, 1971 authorizing me to assist in presentation to the grand jury and trial of the case or cases in the Western District of Missouri in which the Department is informed that various persons, companies, corporations, firms, associations, and organizations to the Department unknown have violated in the above-named district and in other judicial districts laws relating to extortion in aid of racketeering (18 U.S.C. 1951), embezzlement of union funds (29 U.S.C. 501(c)), and the funds of welfare and pension plans (18 U.S.C. 664), payments by em-

ployers to their employees and to officials of labor organizations (29 U.S. C. 186), etc., as set forth in letter of appointment dated March 3, 1971, *and other offenses mentioned therein.*

Mr. DeFeo testified at the evidentiary hearing held July 22–25, 1974, that he, on his own initiative, and without prior authority from anyone, added the words "and other offenses mentioned therein," which we have emphasized, to the oath of office which had been prepared by some unidentified person in the Department of Justice in Washington. It would seem obvious that Mr. DeFeo entertained a real doubt as to whether the words in his oath "etc., as set forth in the letter of appointment dated March 3, 1971," which had been added after the citation of specific statutes in his oath of office, were legally sufficient to incorporate into his oath of office by such a reference, all of the other statutes mentioned in his letter of appointment which were not specifically stated in his oath of office. Similar factual circumstances were established in regard to Mr. Schulke's letter of appointment and his oath of office, except that Mr. Schulke did not add anything to what the unidentified person in Washington had typed into his Form No. DJ–16 (Rev. 12–12–56), oath of office.

As the cases to which we shall later direct attention establish, the question presented in regard to Mr. DeFeo's and Mr. Schulke's authority to act in the Western District of Missouri is much more fundamental than the question which apparently concerned Mr. DeFeo when he decided that words needed to be added in the form of the oath of office sent him from Washington. The first important question presented is whether Congress, by its 1906 enactment of what is now codified as Section 515(a), intended to authorize the Attorney General to establish "field offices" of sections of the Department of Justice throughout the United States, to staff those field offices with Special

Attorneys appointed in the same manner Mr. DeFeo and Mr. Schulke were appointed, and to attempt to vest those Special Attorneys with the identical general power to conduct legal proceedings, civil or criminal, in connection with a group of selected statutes, which the duly appointed United States Attorneys are under duty and authorized by law to conduct.

Should the first question be ruled in the government's favor, a related question is then presented in regard to whether a Special Attorney, appointed in the manner Mr. DeFeo and Mr. Schulke were in fact appointed to staff the Department of Justice's "field office" in the Western District of Missouri were both in fact and in law (1) "specially appointed by the Attorney General," *and* (2) "specifically directed by the Attorney General" to conduct legal proceedings which the regular and duly appointed United States Attorney in this district would otherwise be authorized to conduct, all within the meaning of 28 U.S.C. 515(a).

The question of whether Mr. DeFeo and Mr. Schulke were, in fact, "specially appointed by the Attorney General," within the meaning of Section 515(a), depends on the manner of appointment, on who, in fact, made the appointment, and whether, in fact, such person was authorized by law to do so, assuming, as the record in this case presently indicates, that the Attorney General did not personally make the appointment. And the separate and independent question of whether Mr. DeFeo and Mr. Schulke were "specifically directed by the Attorney General," within the meaning of Section 515(a), to conduct legal proceedings in the Western District of Missouri depends again on whether, as a matter of fact, Mr. DeFeo and Mr. Schulke were given any *specific directions,* within the meaning of Section 515(a), by the Attorney General personally, or by some other person authorized by law acting on his behalf.

All we know thus far from the government's bill of particulars in regard to those questions is that the government does not know and allegedly is unable to find out, whether Mr. Kleindienst, in fact, ever signed Mr. DeFeo's and Mr. Schulke's letters of appointment. We are advised by the government's bill of particulars, however, that the person or persons who in fact selected the statutes to be included in the letters of appointment, a circumstance which may be relevant in the determination of the question whether the Special Attorneys were "specifically directed by the Attorney General," within the meaning of Section 515(a), are presently unknown to the government.[8]

It was apparent from the outset of the evidentiary hearing in this case that the government would not contend that the Attorney General had in fact either (1) personally made any special appointment of either Mr. DeFeo or Mr. Schulke, or (2) that the Attorney General had personally given either Mr. DeFeo or Mr. Schulke any specific directions in regard to their conducting legal proceedings in the Western District of Missouri. It has therefore been obvious from the outset that if the principles stated in United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed. 2d 341 (1974), are not applicable to Section 515(a), as they were held in that case to be applicable to 18 U.S.C. § 2516(1), the government might be able to sustain the lawful authority of Mr. Schulke to appear before the Western District of Missouri grand jury which returned the indictment in this case if it could establish (1) that the Attorney General had power to delegate and had properly delegated the authority vested in him by Section 515(a) to

some qualified person and (2) that the person or persons to whom that delegation had lawfully been made had in turn lawfully exercised the delegated power (a) to specially appoint Mr. Schulke and (b) to specifically direct Mr. Schulke, all as required by Section 515(a). It is clear that the government should be required to file a supplemental bill of particulars which shall accurately state the relevant factual data called for in defendant's motion.

## IV.

■ The evidentiary hearing made clear that the Special Attorneys involved in this case and their superiors in Washington had apparently given no more thought to the question of whether their power and authority to act might be limited by applicable law than had government counsel involved in cases such as United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); United States v. Giordano, supra, and United States v. Chavez, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). We accordingly granted defendant's supplemental motion for discovery and inspection in order to afford the government an appropriate opportunity to present a factual and legal basis for establishing (1) that the Attorney General could lawfully delegate the power conferred upon him by Section 515(a); (2) that the Attorney General had in fact lawfully made the assumed lawful delegation; (3) that the person to whom the power to make special appointments under Section 515(a) had in fact "specially appointed" Mr. DeFeo and Mr. Schulke, within the meaning of that statute; and (4) that such person had also, in fact, and in the proper exercise

8. It would seem obvious that it would be clearly erroneous for this Court to find and conclude that Mr. DeFeo and Mr. Schulke were in fact and in law legally authorized to act in the Western District of Missouri because they were "specially directed" by some unknown person or persons, rather than by

the Attorney General, as required by Section 515(a). Such an unknown person could have been someone never authorized by law to exercise power conferred by the Congress on the Attorney General. That possibility must be eliminated before a valid finding could be be made.

of the Attorney General's delegated power and discretion, "specially directed" Mr. DeFeo and Mr. Schulke to conduct proceedings in the Western District of Missouri within the intended scope and authority of Section 515(a).

The October 21, 1974 order granting defendant's supplemental motion for discovery directed the following material to be produced for *in camera* inspection by this Court:

1. Any Department of Justice guidelines, agreements, memoranda of understanding or regulations not published in the Code of Federal Regulations which touch upon:

(a) The basic authority pursuant to statute of the special attorneys appearing in this case to represent the United States in the Western District of Missouri.

(b) Their authority to appear before grand juries and otherwise to prosecute cases involving the statutory violation alleged in the indictment herein.

(c) The relationship guidelines and division of authority between the purported authority of the special attorneys and the constitutional statutory or any other authority of the United States Attorney for the Western District of Missouri.

(d) The legislative history of 28 U.S.C. §§ 509, 510, 515 and 543.

(e) Each document or memoranda set forth in the Stipulation of July 22, 1974, pertaining to the "special attorneys'" efforts to secure authority from their superiors at the Department of Justice to prosecute the defendant in connection with the subject matters of this indictment. This request embraces any and all memoranda and rough notes made as a result of phone conversations and face-to-face discussion.

(f) Any and all other memoranda, correspondence and written actions taken thereon concerning requests for approval of prosecution of defendant for the offense purportedly stated in the written indictment.

The government has not yet taken advantage of the afforded opportunity to put at rest any and all questions relating to the power and authority of Mr. Schulke to appear before the Western District of Missouri grand jury involved in this case.

The next two parts of this opinion will state the procedural and factual situation thus far established in order that there be no legitimate question about the reasons why the material covered by the order of October 21, 1974 must, under applicable law, be produced for *in camera* inspection.

## V.

Among the many motions filed in this case which are still pending are motions (1) to dismiss for unreasonable preindictment delay; and (2) to dismiss on the ground the United States Attorneys who procured the indictment lacked proper authority to act. It has been stipulated that the first investigation memorandum which in any way referred to the "1969 dues increase election" involved in this case was submitted by the F.B.I. to Mr. DeFeo and to United States Attorney Bert C. Hurn on January 14, 1972.[9]

The stipulation and testimony already adduced makes clear that neither the duly appointed United States Attorney for the Western District of Missouri or any of his duly appointed Assistant United States Attorneys in this district ever had anything of substance to do

---

9. The actual dues increase election apparently took place in 1968. The indictment charges that the defendant made or caused to be made an alleged false entry in regard to that dues increase election sometime between March 10, 1969 and March 24, 1969. As the parties have done in their stipulation, we shall refer to the "dues increase election" as the "1969 dues increase election."

with the pending prosecution. It is stipulated that on March 1, 1972, Mr. DeFeo recommended to one Edward T. Joyce, Acting Chief of the Organized Crime Racketeering Section, Department of Justice, in Washington, D. C. that the defendant be prosecuted in regard to the 1969 dues increase election. That recommendation was never approved. Why it was not approved is presently unknown.

It is further stipulated that well over a year later, and on June 8, 1973, Mr. DeFeo again recommended prosecution in connection with the 1969 dues increase election. That recommendation included a specific recommendation that defendant be prosecuted under 29 U.S.C. § 439. It is stipulated that the second prosecution recommendation, although the subject of a personal discussion on September 19, 1973 by Mr. DeFeo with William S. Lynch, Chief, and Edward T. Joyce and James F. Featherstone, Deputy Chiefs, Organized Crime and Racketeering Section, Department of Justice, was never approved or authorized for presentation to Judge Hunter's 1971 Special Grand Jury. The nature of that discussion and the reasons why that second recommended prosecution was not approved is not presently known.

It is stipulated that although Judge Hunter's 1971 Special Grand Jury had heard all of the testimony of all the witnesses who testified in connection with the 1969 dues increase election, no indictment was ever sought from that Special Grand Jury. Rather, it is stipulated that a third recommendation for prosecution was made after Judge Hunter's 1971 Special Grand Jury had been discharged. That recommendation, dated January 17, 1974, was forwarded by Mr. Schulke, with Mr. DeFeo's approval, to William S. Lynch, Chief, Organized Crime and Racketeering Section. It is further stipulated that Mr. Lynch, Chief, and Mr. Featherstone, Deputy Chief, on February 4 and 5, 1974, advised Mr. DeFeo by telephone that Assistant Attorney General Henry E. Petersen, Criminal Division, had authorized the pending prosecution. It is stipulated that Assistant Attorney General Petersen's authorization was never confirmed in writing to the United States Attorney for the Western District of Missouri or the Kansas City Field Office of the Organized Crime and Racketeering Section. Why that approval was never confirmed in writing to anyone is not presently known.

It is further stipulated that Mr. Schulke appeared before a 1974 Grand Jury, that he had an F.B.I. agent read the testimony of a number of selected witnesses who had given their testimony in regard to the 1969 dues increase election to the 1971 Special Grand Jury. On the basis of that evidence, the 1974 grand jury was requested to return and it did return the indictment involved in this case.

It is not necessary to recite in detail the stipulated evidence relating to the government's knowledge that at the time it sought and obtained the pending indictment it knew that the court reporter's notes and tape recording of allegedly inconsistent testimony of the government's principal witness, one Sherman Starks, given by him on March 21, 1969 in a civil trial held that day before Judge Hunter, had been lost and that the full scale F.B.I. investigation ordered by Judge Hunter established that the notes and tape could not be found. Nor is it necessary at this time to do more than note that the government did not permit Mr. Starks to appear personally before the 1974 grand jury that returned the indictment in this case.

What has been briefly said in regard to those and the other circumstances clearly establishes that a substantial due process question of preindictment delay is presented in this case and that the material ordered produced may well contain evidence favorable to the defendant.

As stated in our October 21, 1974 order, we are convinced that evidence

which could be favorable to the defendant might be revealed by paragraphs 1(e) and 1(f) of defendant's supplemental discovery motion which we ordered produced for *in camera* inspection. Those paragraphs relate generally to Mr. DeFeo's 1972 and 1973 unsuccessful efforts to obtain approval of defendant's prosecutions in regard to matters related to the 1969 dues increase election. We believe it is equally obvious that the same material may contain Brady v. Maryland material relevant and material to defendant's contentions in regard to improper use of a grand jury, based on principles stated in United States v. Estepa (2nd Cir. 1972) 471 F.2d 1132, and similar cases.

## VI.

Paragraph 1(a) through 1(d) of our order of October 21, 1974, afforded the government the opportunity to produce the material relevant to the questions presented in regard to the authority of Mr. Schulke to appear before the grand jury. Those paragraphs called for the *in camera* production of Department of Justice guidelines, agreements, memoranda of understanding or regulations not published in the Code of Federal Regulation which may relate to the basic authority of the Special Attorneys appearing in this case and the guidelines which regulate the relationship and division of authority between a Special Attorney operating out of a Department of Justice "field office" and the duly appointed United States Attorney for the Western District of Missouri.

Under the undisputed factual circumstances of this case, it has already been established that Mr. Schulke was solely responsible for the presentation of the exceedingly limited evidence actually presented to the 1974 grand jury that returned the pending indictment. Unless he may, in fact and in law, be properly considered as an "attorney for the government," he must, under Rule 6 of the Federal Rules of Criminal Procedure,

be considered as an unauthorized person and any indictment obtained in violation of that rule must be dismissed. Whether Mr. Schulke was authorized to appear before the grand jury involved in this case is dependent upon whether, pursuant to and within the meaning of Section 515(a), he was in fact and in law "specially appointed by the Attorney General" and whether he was in fact and in law "specifically directed" to conduct proceedings in the Western District of Missouri. All regulations and guidelines relating to the Attorney General's delegation of power conferred under Section 515(a) and the manner in which such assumed delegation of power was required to be exercised, whether or not published in the Code of Federal Regulations, is obviously relevant and material to the determination of whether under the circumstances of this case, the delegated power and authority of the Attorney General conferred by Section 515(a) was properly and effectively exercised.

The cases upon which the government relied in its memorandum of law filed September 20, 1974, do not support the government's contention that, without further factual support, Mr. Schulke may be considered as a "government attorney" properly authorized under Rule 6 to appear before a Western District of Missouri grand jury. Indeed, the cases upon which the government attempts to rely establish that, absent the establishment of additional factual circumstances, which may or may not be possible, it may be doubtful that Mr. Schulke's authority has been or can be established.

Those cases indicate that whether Mr. Schulke's authority may, in fact and in law, be eventually established may, in turn, be influenced by the answer to the question of what guidelines and regulations, whether published or not, were in fact established and followed in order properly to delegate the power of special appointment and the power of specific direction vested in the Attorney General by Section 515(a). It is obvi-

ous that the defendant's motion to dismiss based on the ground of Mr. Schulke's lack of authority may not be determined until it is established how, in fact, the guidelines and regulations of the Department of Justice were followed in particular regard to Mr. Schulke. We ordered *in camera* production of the material described in paragraphs 1(a) to 1(d) of defendant's supplemental motion for discovery and inspection for the reason that under Brady v. Maryland it must reasonably be said that such material may contain evidence favorable to the defendant. We shall now discuss our view of the cases upon which the government has attempted to rely and other cases which state the applicable rules.

### VII.

■ United States v. Crosthwaite, 168 U.S. 375, 18 S.Ct. 107, 42 L.Ed. 507 (1897), relied upon by the government, was decided before the Act of June 30, 1906, was passed. That case is generally and properly cited to support the proposition that absent a specific Congressional grant of power in excess of that conferred by the Act of June 22, 1870, which created the Department of Justice, the Attorney General does not have power and authority to appoint his own set of Special Attorneys to serve in various judicial districts of the United States to duplicate the regular and duly appointed United States Attorneys authorized by the Congress.

United States v. Smyth, 104 F.Supp. 283, 306 (N.D.Cal.1952), relied upon by the government, is clearly distinguishable on its facts.

In discussing the precise and narrow question presented in that case as it related to "the presence of unauthorized persons in the grand jury room," Judge Fee stated on page 305 of 104 F.Supp. that "the charge of unauthorized presence is based upon the fact that O'Gara was in the grand jury room." The "cardinal point [of] whether O'Gara was au-

thorized," was ruled in the government's favor because it was undisputed on the facts that O'Gara had been officially appointed an assistant United States Attorney pursuant to the authority conferred by present Section 542 of Title 28, U.S.C. Judge Fee significantly stated in *Smyth* that "if there had been claim or allegation that some other person besides an Assistant United States Attorney was present, the court would have felt bound to try the fact." That conclusion was supported by footnote 94 on page 305 of 104 F.Supp. which stated in part:

94. The cases where courts have quashed indictments owing to an unauthorized presence have been those where there was no authority to act or where the court held that the person was not a United States Attorney nor an Assistant nor one empowered by law to act for this official. See United States v. Heinze, C.C., 177 F. 770; United States v. Kilpatrick, D.C., 16 F. 755; United States v. Philadelphia Railway Co., D.C., 221 F. 683; United States v. Goldman, D.C., 28 F. 2d 424.

Under the undisputed facts of this case, Mr. Schulke is *not* a duly appointed Assistant United States Attorney, as was O'Gara in United States v. Smyth. One of the cardinal points of this case is whether Mr. Schulke was otherwise authorized to appear before the grand jury. That question must necessarily be viewed in light of the rationale of the line of cases cited by Judge Fee in *Smyth's* footnote 94.

United States v. Heinze (S.D.N.Y. 1910), 177 F. 770, the first case cited in *Smyth's* footnote 94, determined that an expert accountant could not properly be considered as a "special assistant to a United States Attorney" eligible for appointment under the Act of June 30, 1906, and that such a person therefore was not legally authorized to appear before the grand jury. Judge Hough or-

dered that the indictment be dismissed. He concluded that:

It has never to my knowledge been denied or doubted that the rule of the common law is that a grand jury, while deliberating upon an indictment or presentment, shall listen to witnesses who give testimony, and to no one else except the authorized law officers of the crown or the commonwealth.

\* \* \* \* \* \*

So far as this court is concerned, little time need be spent in collating authorities to show what the rule is. It has been done too recently by Thomas, J., in United States v. Rosenthal (C.C.) 121 F. 862. [177 F. 772]

United States v. Rosenthal, relied upon by Judge Hough in *Heinze*, was also decided before the Act of June 30, 1906 was enacted. The government argued that particular sections of the Act of June 22, 1870, together with earlier statutes, vested power in the Attorney General to authorize a Special Attorney appointed by the Attorney General to appear before a grand jury in the Southern District of New York. Judge Thomas concluded that the Act of June 22, 1870, must be read in light of the 1868 decision of the Supreme Court in the Confiscation Cases, 7 Wall. 454, 19 L.Ed. 196 (1868), which concluded that "public prosecutions . . . are within the exclusive jurisdiction of the District Attorney."

Judge Thomas carefully examined the various sections of the Act of June 22, 1870 which established the Department of Justice and concluded that none of the sections of that Act authorized the Attorney General to appoint a Special Attorney to appear before a grand jury. He concluded that the claim that such power had been vested by the Act of June 22, 1870 must be read in light of "the fundamental policy of the government" which vested the duty and responsibility for the conduct of criminal proceedings in a regularly appointed United States Attorney duly appointed

and qualified by law. Judge Thomas commented that a construction consistent with the government's contention would be contrary to "the settled policy of the government" and would involve a "comprehensive transfer of authority from the local law officer of the community to the central law officers of the government, in whom such authority has never been reposed" [121 F. at 873]. Judge Thomas added:

Every citizen is amenable to the secret inquisition of the grand jury, and he may demand justly that his essential rights be guarded by the wholesome preservation of settled systems and policies, that give greater certainty to legal proceedings, and fix on the designated prosecuting officer of the locality inevitable accountability for what is done or omitted. The inconvenience of resubmitting the matter to the grand jury is temporary; the injustice of denying the defendants investigation pursuant to the law of the land would be perpetual. [Ibid]

In United States v. Kilpatrick (W.D. N.C.), 16 F. 765, (1883), the second case cited in *Smyth's* footnote 94, the unauthorized person was someone the Department of Justice called an "examiner," who apparently had been sent down to the Western District of North Carolina from Washington. The indictment was dismissed on the ground that such a person could not properly appear before a grand jury in that district. United States v. Philadelphia Railway Co. (E.D. Pa.1915), 221 F. 683, the third case cited in *Smyth's* footnote 94, reflects the unsuccessful effort to resolve the conflict which existed in the cases prior to the promulgation of Rule 6(d) which expressly authorized stenographers to be present while the grand jury is in session. The Attorney General sought to use present Section 515(a) to provide stenographers for the benefit of a local United States Attorney. Judge Thompson recognized that under the authority of the Act of June 30, 1906, "the matter

of appointment of special assistants to the district attorney is entirely within the discretion of the Attorney General, and Mr. Clift and Mr. Head both come within the term 'attorney or counselor.'" [221 F. 685]. But under the factual circumstances of that case, the court found that neither Mr. Clift nor Mr. Head had been "appointed to conduct the grand jury proceedings and that any thought of either of them conducting the proceedings or taking any part in the examination of witnesses or presentation of evidence was not present in the mind of any officer of the government, nor of themselves." [Ibid].

The following conclusion, consistent with the basic rationale of *Rosenthal* and *Heinze*, both of which were cited with approval, emphasized that the "specific direction" provision of present Section 515(a), as well as its "special appointment" provision, must be complied with in order to authorize the appearance of one "specially appointed" under the authority of that section to appear before a grand jury. The court stated:

> There is no doubt that, under section 363, the Attorney General may employ attorneys or counselors at law to assist the district attorneys in the discharge of their duties; but the provisions authorizing such special assistants to go before the grand jury is contained in the act of June 30, 1906, and requires under that act *a specific direction of the Attorney General* to conduct grand jury proceedings. [Emphasis ours] [Ibid].

United States v. Goldman (D.Conn. 1928), 28 F.2d 424, the fourth and last case cited in *Smyth's* footnote 94, involved an appointment by the Attorney General of one Charles F. Roberts under present Section 515(a) to serve in the District of Connecticut. The ap-

pointment letter, addressed to Roberts, signed by Attorney General Sargent, was in substantially the same form as Mr. DeFeo's and Mr. Schulke's letters of appointment except "alleged violations of the National Prohibition Act" were included in that letter, rather than the list of the various statutes included in the DeFeo and Schulke letters. The court was required to reach one of the questions presented in this case, namely, whether the appointment letter itself could be said to comply with the express requirements of the present Section 515 (a).

Judge Thomas concluded that a Special Attorney may not be said to be properly appointed under what is now present Section 515(a) unless he holds "a commission from the Attorney General of the United States, specifying by name the case or cases to which his employment relates" [28 F.2d at 430]. Judge Thomas directed particular attention to the requirement of Section 515(a) which provides that an appointee under that section must be "specifically directed by the Attorney General" and concluded that this language required that "the commission which may be issued under that act *must* designate the specific case or cases to which the employment relates and the district or districts to which it extends."

It was concluded in regard to the question of statutory construction presented that:

> If this is not so, it would follow that the Attorney General of the United States could, under the act now under discussion, issue a roving commission without any limitations, extending to every district in the United States and embrace all criminal investigations. No such power is conferred by the act. [28 F.2d 430] [10]

---

10. If anyone is under the impression that no Attorney General would ever attempt to assume that Section 515(a) confers power and blanket authority to appoint a duplicate set of Department of Justice Special Attorneys

to serve in the various judicial districts throughout the United States, one should read with interest Acting Assistant Attorney General Keeney's letter of August 2, 1974 to Mr. DeFeo, written after the question of

It is apparent that United States v. Smyth does not support the government's contention in regard to Mr. Schulke's authority to appear before the Western District of Missouri grand jury involved in this case. As we have suggested, the line of cases approvingly cited in *Smyth's* footnote 94 do establish that an important and substantial question is presented in all cases in which the government may have been routinely using a modified form of appointment letter similar to that involved in *Goldman*.[11]

## VIII.

The other cases cited and relied upon by the government do not sustain its contention that Mr. Schulke was properly authorized to appear before a Western District of Missouri grand jury. Both United States v. Giordano, *supra*, and May v. United States (8th Cir. 1916),

---

Mr. DeFeo's authority in this case was raised. That letter states:

Mr. Michael A. DeFeo
Criminal Division
Department of Justice
Washington, D. C.
Dear Mr. DeFeo:

The Department is informed that there have occurred and are occurring in the Western District of Missouri and other judicial districts of the United States violations of federal criminal statutes by persons both known and unknown to the Department at this time.

As an attorney at law you are specially retained and appointed as a Special Attorney under the authority of the Department of Justice to assist in the trial of the aforesaid cases in the aforesaid district and other judicial districts of the United States in which the Government is interested. In that connection you are specially authorized and directed to file informations and to conduct in the aforesaid district and other judicial districts of the United States any kind of legal proceedings, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which United States Attorneys are authorized to conduct.

Your appointment is extended to include, in addition to the aforesaid cases, the prosecution of any other such special cases arising in the aforesaid district and other judicial districts of the United States.

You are to serve without compensation other than the compensation you are now receiving under existing appointment.

Please execute the required oath of office and forward a duplicate thereof to the Criminal Division.

Sincerely,
/S/ John C. Keeney
John C. Keeney
Acting Assistant Attorney General

The Department of Justice has apparently ceased its use of Form No. DJ–16 (Rev. 12–12–56) for Special Attorneys. For Mr. De-

Feo's new oath of office is on a new printed form which states only that:

I, Michael A. DeFeo, do solemnly swear that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office of Special Attorney on which I am about to enter in the Western District of Missouri pursuant to the authorization of John C. Keeney, Acting Assistant Attorney General, Criminal Division, Department of Justice, dated August 2, 1974, and filed herewith: So Help Me God.

11. We gather that such might be the case from the statement in the government's bill of particulars which states that Mr. DeFeo's and Mr. Schulke's letter of appointment "are typical of those generally issued to all field 'Special Attorneys' of the Organized Crime Division, United States Department of Justice," and from the further fact that the form of the oaths of office involved in this case apparently have not been revised since December 12, 1956.

Indeed, there apparently was not any revision of substance at least since the administration of Attorney General Sargent, an appointee of President Herbert Hoover, until that recently made in connection with Mr. DeFeo's new oath quoted in footnote 10, above. The form and substance of the Department of Justice's form letters and form oaths, as they existed before the questions presented in this case came into focus, apparently were not the subject of judicial inquiry, because none of the Attorney Generals, except those who have comparatively recently held that high office, have attempted to make such extensive use of the power conferred on the Attorney General by the Act of June 30, 1906.

236 F. 495, relate to questions of whether the power conferred upon the Attorney General under Section 515(a) may be delegated, and, if so, how that delegation must be accomplished. The refusal of the government to make the ordered *in camera* production simply means that such questions are not ripe for determination because of the absence of an appropriate factual base. We recognize the authority of *May* but we are presently unable to determine whether principles stated in that case may be applicable on the delegation question because of a presently inadequate factual base.

Shushan v. United States (5th Cir. 1941), 117 F.2d 110, is cited by the government as having "rejected the allegedly unauthorized participation in grand jury proceedings argument made by the defendants in that case." There was in fact a question presented in that case in regard to the authority of Special Attorneys appointed under present § 515(a). But the question actually presented was an extremely narrow one involving factual circumstances clearly distinguishable from those presented in the case at bar. We believe that *Shushan* properly concluded under the circumstances there presented that there was no unauthorized intrusion into the grand jury room. That case, however, is distinguishable on its facts from the pending case.

Wall v. United States (10th Cir. 1967), 384 F.2d 758, also cited by the government, did not involve a grand jury proceeding at all. The court flatly stated that "the proceedings were initiated by, and the trial was under the control of, the United States Attorney" and that "decisions concerned with participation in grand jury proceedings by unauthorized persons are not applicable."

United States v. Powell (E.D.Mo. 1948), 81 F.Supp. 288, cited and relied upon by the government, concluded that "a more narrow inquiry" was presented in that case than that presented in United States v. Heinze, 177 F. 770, one of the cases cited in *Smyth's* footnote 94. On the facts, Judge Hulen stated that "the sole question is whether or not [the Special Attorney] exceeded his authority and became an unauthorized person by remaining in the grand jury room or going in and taking part in an investigation of a Primary Election instead of restricting his activities solely to the General Election following the Primary Election." Judge Hulen decided the narrow question presented by concluding that under the factual circumstances presented in *Powell*, "the Attorney General did not exceed his authority in taking part in investigating frauds connected with the Primary Election which selected candidates for the General Election named in his commission, that his authority extended to investigation of election frauds in connection with the 1946 General Election and that fraud in a Primary to select candidates for such General Election is not so far removed as to be an abuse of authority or complete deviation from authority." The rationale of *Powell* was based upon the expressly stated assumption that "the case now before the Court is admittedly one where the party in question was lawfully in the grand jury room." The defendant in this case disputes that assumption. *Powell* is obviously distinguishable.

United States v. Hall (9th Cir. 1944), 145 F.2d 781, cited by the government, must, in our judgment, be read in light of the narrow question determined by the district court, as reflected in the district court's opinion in United States v. 1,960 acres of land, etc. (S.D. Cal.1944), 54 F.Supp. 867. The Court of Appeals found and concluded that the Attorney General had both specifically directed the Lands Division attorney to handle the particular condemnation case involved and that the particular special attorneys had been specially appointed "as attorneys to handle case No. 2567–PH on behalf of the United States." The Court of Appeals, we believe proper-

ly, ruled the very narrow question presented by concluding, under the factual circumstances involved, that a special attorney thus "specially appointed" and "specifically directed" was authorized either "to cooperate with the district attorney or to proceed to handle such litigation independent of the district attorney, and any officer of the Department of Justice may act in the same manner and to the same extent *providing he is authorized so to do by the Attorney General.*" (emphasis ours). [145 F.2d 785]. The factual circumstances involved in *Hall* are distinguishable from the undisputed factual situation thus far presented in the case at bar. Robinson v. United States (8th Cir. 1964), 327 F.2d 618, the last case cited in the government's brief, of course, does not touch the question presented and therefore does not warrant discussion.

### IX.

While we believe our discussion of the cases relied upon by the government indicates our view of the applicable rules of decisions, we shall discuss other authorities which are consistent with what we have thus far stated. The Annotation in 4 A.L.R.2d 392 on the subject of "Presence in Grand Jury Room of Person other than Grand Juror as affecting Indictment," makes reference to present § 515(a) and collects the various cases construing the predecessor statutes, all of which, of course, go back to the Act of June 30, 1906. The Annotator accurately summarizes the applicable federal rule by stating that "the appearance and participation of a special assistant not properly appointed or specifically directed by the Attorney General within the meaning of the statute has been held ground for setting aside an indictment."

United States v. Virginia-Carolina Chemical Co. (M.D.Tenn.1908), 163 F. 66, involved a situation in which the Attorney General had appointed two antitrust lawyers to represent the govern-

ment and to assist in the grand jury investigation of the Fertilizer Trust in that district. The appointment and commission, however, was issued shortly before the passage of the Act of June 30, 1906. Under the circumstances, and consistent with the cited opinion of the Supreme Court in *Crosthwaite*, the court held that no statute other than the Act of June 30, 1906, could authorize an appearance before a grand jury. The indictment for violation of the antitrust laws was accordingly dismissed. That case underscores the prime importance of giving Section 515(a) a construction consistent with the Congressional intent expressed when the Act of June 30, 1906 was enacted. For the Congress has not passed any legislation broadening the authority of the Attorney General since it acted in 1906.

United States v. Cohen (D.Mass.1921), 273 F. 620, involved an appointment under present § 515(a). The specific directions given the Special Attorney, however, did not purport to authorize him to file informations, as distinguished from participation in the conduct of grand jury proceedings to obtain an indictment. In dismissing an information filed by the Special Attorney, the court concluded:

The power to bring informations which charge crime and on which warrants of arrest issue is a great power, carrying with it possibilities of serious oppression, if improperly used. . . . The power is lodged in the United States Attorney (by statute as to certain crimes, R.S. § 1022 [Comp.St. § 1686]), and in the Attorney General. No statute authorizing the delegation of it has come to my attention, except the act of 1906 which, as above noted, limits the delegation to such matters as are covered by special direction. Both by the statute, therefore, and by general principles of law, a delegation of this power, if intended, must be made in clear and precise terms, and not left to in-

ference or implication; it is not conferred by authority to conduct grand jury proceedings. [273 F. 621]

The question presented in that case, as is true of one of the questions presented in this case, is not whether the Attorney General could have properly appointed and properly authorized a Special Attorney to appear before a grand jury to obtain an indictment; the question was whether he had done so. And that question turned in that case on whether the specific directions given that Special Attorney were broad enough to authorize the action he attempted to take. As Judge Hand later stated in United States v. Morse (S.D.N.Y.1922), 292 F. 273, 276, the difficulty with the Attorney General's appointment in *Cohen* was "not that the authorization was too broad, but that it was too narrow, to cover the case." The related question presented in this case is whether the Attorney General's directions were too broad, in the sense that the Special Attorney may not have been *"specifically directed"* to do anything, within the meaning of § 515(a), except to go to the Western District of Missouri and to act like a duly appointed United States Attorney in regard to a group of statutes listed on a set of form letters and form oaths.

United States v. Huston (N.D.Ohio 1928), 28 F.2d 451, involved two valid appointments of one Sylvester R. Rush as a "special assistant to the Attorney General" under the Act of June 30, 1906. He was given two commissions and took two oaths. The first commission contained a specific direction to proceed against particular named defendants for specifically stated violations of the mail fraud statutes. His commissions also specifically "directed [him] to conduct in the Western District of Missouri or in any judicial district where the jurisdiction thereof lies, any kind of legal proceeding, civil or criminal, including grand jury proceedings." Mr. Rush was issued a similar commission in regard to the District of Minnesota. He, however, rather than proceeding either to the Western District of Missouri or to the District of Minnesota, proceeded to the Northern District of Ohio, appeared before a grand jury in that district and obtained an indictment.

The court concluded that present Section 515(a) required "a specific direction by the Attorney General to participate in the conduct of grand jury proceedings in this case, issued in advance of such appearance." The court took appropriate notice of what seemed to have been the practice of Attorney General Sargent to throw in a broad catch-all clause in his letters of appointment which purported to provide that a particular Special Attorney was authorized to represent the United States "in any judicial district where the jurisdiction thereof lies." [12] The court held that such a broad and indefinite direction was insufficient to clothe the Special Attorney with any valid authority to appear before any grand jury in any district other than the particular district specifically named in the letter of appointment. The indictment was accordingly dismissed because "the proceedings before the grand jury were vitiated by the unauthorized appearance therein by Mr. Rush." One of the questions in this case is whether a similar broad and indefinite direction in a letter of appointment to conduct grand jury proceedings against "unknown persons" is any more valid than the direction involved in United States v. Huston.

The cases discussed in this part of this opinion, together with the cases

---

12. The form letters of appointment involved in this case still carry that indefinite and broad direction to conduct "any kind of legal proceeding" in a named district, the Western District of Missouri in this case, and "in any other district where the jurisdiction thereof lies."

which we have discussed earlier, establish that the power and authority conferred upon the Attorney General by the Act of June 30, 1906, has not always been exercised in a manner consistent with the express requirements of that statute.

We believe it imperative, for the reasons we stated at the outset of this opinion, that the questions relating to whether relatively recently appointed Attorney Generals may not have done a much better job of complying with the express requirements of the Act of June 30, 1906, than did some of the former Attorney Generals who have served since that statute was passed should be definitively answered.

## X.

Accordingly, and for the reasons stated, it is

Ordered (1) that the government's request for reconsideration of the orders entered by this Court on October 21, 1974 should be and the same is hereby denied, except to the extent stated below. It is further

Ordered (2) that the government shall, within fifteen (15) days of this order, prepare, serve, and file a supplemental bill of particulars which shall furnish the information which it failed to furnish in the bill of particulars filed by it on November 4, 1974. It is further

Ordered (3) that, having at the government's request carefully reconsidered our order of October 21, 1974, which granted defendant's supplemental motion for discovery and inspection, filed September 5, 1974, we find and conclude that such order should be and is hereby declared to be in full force and effect. It is further

Ordered (4) that all further proceedings, including but not limited to the taking of any action pursuant to the government's tentative suggestion that it "suffer dismissal" of this case rather than seek appropriate appellate review

or comply with the said order of October 21, 1974, should be and the same are hereby deferred for a period of ten (10) days in order to permit government's counsel's superiors in the Criminal Division of the Department of Justice an appropriate opportunity to reconsider the directions given by them as those directions are stated in the government's response filed by it November 4, 1974. It is further

Ordered (5) that if this Court is advised by the government's service and filing of an appropriate statement within ten (10) days of this order that (1) the directions to "suffer dismissal" have been withdrawn; and (2) that, upon reconsideration, the government has concluded either (a) that it will comply with this Court's order of October 21, 1974 granting defendant's supplemental motion for discovery within ten (10) days after the service and filing of its statement; or (b) that it wishes to seek an appropriate appellate review of the said October 21, 1974 order, this Court will thereafter direct further proceedings which may be appropriate under the circumstances. It is further

Ordered (6) that if the government does not wish to take advantage of the opportunity for reconsideration afforded it as above provided, it shall, in that event, prepare, serve, and file within ten (10) days of this order an appropriate statement which shall advise this Court that government counsel's superiors in the Criminal Division of the Department of Justice in Washington will neither seek appropriate appellate review, nor will they withdraw the tentative directions they have given that the government "suffer dismissal" of this case rather than obey what would thus be implicitly conceded to be this Court's valid order of October 21, 1974. It is further

Ordered (7) that any requests for extensions of time above provided for good cause shown shall be presented in

448

writing before the expiration of time above allowed.

## MEMORANDUM AND ORDERS DISMISSING INDICTMENT WITH PREJUDICE

### I.

On November 15, 1974, we entered detailed orders under which the government was afforded an appropriate opportunity to reconsider its then tentative position that it would "suffer dismissal" of the pending indictment rather than comply with this Court's order of October 21, 1974 requiring *in camera* production of material in the government's possession. The government's response to our October 21, 1974 orders, filed November 4, 1974, shows that the government's refusal to comply with those orders was apparently directed by someone in the Department of Justice in Washington.

On November 25, 1974, the government filed a response to the orders entered November 15, 1974. That response was signed by an Assistant United States Attorney for the Western District of Missouri who has never had any prior contact with this case, and by Mr. Schulke. That response states in substance that the Department of Justice cannot decide whether it wishes to seek an appropriate appellate review of our October 21, 1974 orders. Indeed, the government's response expresses the notion that it cannot make up its mind in that regard until "after entry of a final, appealable order by the Court." [1]

The only reading which may reasonably be given the government's response is that, after full opportunity for reconsideration of its position, it wishes to suffer dismissal of this case rather than either comply with our orders of October 21, 1974, or seek an appropriate appellate review of those orders. Principles stated in Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L. Ed.2d 427 (1971), and Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), require this Court to assume that Mr. DeFeo's and Mr. Schulke's superiors in Washington have been consulted and that those persons have expressly approved the position stated to this Court in the government's most recently filed response.

Consistent with Chief Justice Burger's comment in *Santobello*, we designed procedures in our November 15, 1974 orders which would reasonably permit the prosecutor's office to carry its burden of "letting the left hand know what the right hand is doing." While *Giglio* concluded in regard to less complicated circumstances that "the prosecutor's office is an entity and as such it is the spokesman of the Government," the procedures in this case were designed in light of the fact that Mr. DeFeo and Mr. Schulke were apparently required to follow directions of their superiors in the Department of Justice in Washington, even to the extent of subjecting themselves to possible contempt of court proceedings. [2]

1. On November 29, 1974, the government filed a supplemental bill of particulars which stated that it has supplied all information in its possession "to the best of its ability" and that it is "unable to further particularize information which is not in its possession." In other words, the government continues to attempt to maintain its position that neither does it know, nor can it find out whether Richard G. Kleindienst, during the times he was serving as the Deputy Attorney General of the United States and as the Acting Attorney General of the United States, did or

did not actually sign Mr. DeFeo's and Mr. Schulke's letters of appointment.

The bill of particulars question need not be further noticed because of the controlling question presented by the government's refusal to comply with the order requiring production for *in camera* inspection.

2. Chief Justice Burger cited with approval in *Giglio* two of the American Bar Association Minimum Standards for Criminal Justice. Section 2.1(d) of the Standards relating to Discovery and Procedure before Trial, cited

The notion that the Department of Justice cannot make "a determination whether to seek appellate review [until] after entry of a final, appealable Order by the Court" is untenable. Nor does such a notion afford the government an excuse to refuse to comply with this Court's orders of October 21, 1974.

The government's specific attention was directed to the manner in which appropriate appellate review could have been sought before the entry of a final order of dismissal. On page 431 of our memorandum opinion of November 15, 1974, we directed the government's attention to Will v. United States, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967). We are satisfied from both the form and substance of the government's current response, which we must assume was filed with the approval of and pursuant to the directions of the highest authorities in the Department of Justice in Washington, that the government has concluded that it no longer desires to continue the prosecution of this case. The government's obvious willingness to suffer dismissal of this

particular case will not, however, cause the substantial question presented in regard to the authority of special attorneys appointed pursuant to the Act of June 30, 1906, present Section 515(a), Title 28, U.S.C., to go away. The same questions will undoubtedly be presented in other cases in which one of the government's special attorneys will have appeared before a Western District of Missouri grand jury.

So far as disposition of this particular case is concerned, we are convinced that under all the circumstances, and particularly those which relate to the manner in which the Department of Justice has apparently exercised remote control of the government's position, in the exercise of appropriate judicial discretion, we should forego for the time being the institution of any proceedings pursuant to Rule 42(b) of the Rules of Criminal Procedure, and that we simply dismiss with prejudice the pending indictment. We shall do so.

## II.

We believe it appropriate, in a manner similar to that followed by Judge Pet-

---

405 U.S. at 154, 92 S.Ct. 763, provides in connection with the prosecutor's obligation of disclosure to the accused that "The prosecuting attorney's obligations under this section extend to material and information in the possession or control of members of his staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office." Section 2.1(c) of that same Standard provides that "Except as is otherwise provided as to protective orders (section 4.4), the prosecuting attorney shall disclose to defense counsel any material or information within his possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor." We have consistently made clear that our orders require production only for *in camera* inspection and that proper protective orders would thereafter be given appropriate consideration.

Section 3.11(a) of the Standards relating to the Prosecution Function, cited 405 U.S. at 154, 92 S.Ct. 763, goes even further than Section 2.1(d) of the pretrial discovery

standard in that it provides that "It is unprofessional conduct for a prosecutor to fail to make timely disclosure to the defense of the existence of evidence, known to him, supporting the innocence of the defendant. He should disclose evidence which would tend to negate the guilt of the accused or mitigate the degree of the offense or reduce the punishment at the earliest feasible opportunity." Although subsections (b) and (c) of Section 3.11 were not cited in *Giglio*, both may be eventually applicable to this case. They provide "The prosecutor should comply in good faith with discovery procedures under the applicable law. (c) It is unprofessional conduct for a prosecutor intentionally to avoid pursuit of evidence because he believes it will damage the prosecution's case or aid the accused."

Under the procedures designed and followed in this case we believe it appropriate that primary focus be directed on the government's position as directed by the superiors in the Department of Justice in Washington, rather than on the local attorneys who are apparently required to follow directions regardless of what the consequences may be.

tine in United States v. Gramolini, (D. R.I.1969) 301 F.Supp. 39, 42, to state our views in regard to what action the government may expect this Court to take in future cases. We accordingly put the government on notice that in future cases, when it may become apparent, on the facts, that some special attorney, appointed and directed under substantially the same circumstances as Mr. DeFeo and Mr. Schulke were in this case, will have appeared before a Western District of Missouri grand jury, we intend to direct proceedings and to enter orders in a manner consistent with principles stated and the procedures followed in this particular case.

 We are convinced, contrary to the government's view, that the proper administration of federal criminal justice requires that the substantial questions presented should receive the earliest possible review and determination by the appellate court of the United States. Recent Annual Reports of the Attorney General of the United States indicate that the questions presented in this case are not unique to this district. The 1971 Annual Report of Attorney General John N. Mitchell, for example, stated that "The Department of Justice continued in fiscal 1971 to play a leading role in President Nixon's program to elevate and reinforce the law" [Ibid, p. 1]. That report emphasized "the expansion of strike forces from 13 to 18" and stated that the Organized Crime and Racketeering Section's leadership "is composed of a Chief and four Deputy Chiefs, each of whom oversees the strike force activity in a specific geographical region of the United States" [Ibid p. 63]. The 1971 Report further stated that support services were provided by an "Intelligence Unit" which maintains a "central automated data facility, under which "the Organized Crime and Racketeering Section now has a highly sophisticated organized criminal intelligence system—probably the most

effective of its kind in the world" [Ibid p. 63].

In his 1972 Annual Report, Attorney General Richard G. Kleindienst stated that the number of attorneys assigned to the Organized Crime and Racketeering Section had increased from 83 in January, 1970, to 112 in September, 1971, to 131 as of June 30, 1972, and that 106 of the 131 were assigned to 18 strike force locations in major cities throughout the nation. The 1972 Annual Report stated that the strike force idea had been "initiated on an ad hoc basis in 1967" but that "since 1969 the strike forces have been put on a permanent basis and increased from 7 to 18." [Ibid, p. 90]. That Report makes clear that "the Special Operations Unit" handles all matters in the Organized Crime and Racketeering Section which are not expressly assigned elsewhere," including but certainly not limited to the development of "guidelines and draft memoranda establishing general policy" [Ibid, p. 94].

The 1973 Annual Report of the Attorney General comments upon the "conversion" of the ad hoc strike forces "to permanent field offices located in Buffalo, Detroit, Brooklyn, Philadelphia, Newark, Chicago, Miami, Boston, New York City, Cleveland, Los Angeles, St. Louis, New Orleans, Pittsburgh, Baltimore, San Francisco and Kansas City" [Ibid, p. 80]. The automated central data bank was reported in 1973 to contain three and a half million items of intelligence [Ibid, p. 81].

Although each of those recent Annual Reports reflects a continually expanding instrumentality of the Attorney General of the United States, none of those Reports indicate that the network of what are now considered as permanent field offices has had any approval of the Congress of the United States, other than its passage of the Act of June 30, 1906. Under the circumstances, we have great difficulty in understanding why

the supervisors in Washington do not desire an immediate testing of the exercise of the power by various Attorney Generals over the relatively recent past.

We believe the views stated in this Part II of this opinion are implicitly supported by the recent action of the Congress when both Houses refused to sustain the President's veto of the recent amendments to the Freedom of Information Act. The Conference Report on H.R. 12471 (H. Report No. 93–1380) shows that the Congress intended by those amendments that many agency orders and statements of policy not heretofore published in the Federal Register were to see the light of day and that the Supreme Court's narrow construction of the power of a federal court to order *in camera* inspection, as stated in Environmental Protection Agency v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), was expressly rejected by the Congress.

We recognize, of course, that this case is not an enforcement action under the Freedom of Information Act. But the principles involved are much the same. Those principles, as Mr. Justice Douglas pointed out in his dissenting opinion in *Mink*, stem from the wisdom of the following words of James Madison, which he quoted to close his opinion:

> A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives. [410 U.S. at 110–111, 93 S.Ct. at 847].

### III.

For the reasons stated, it is

Ordered that the pending indictment should be and the same is hereby dismissed with prejudice.