UNITED STATES of America, Plaintiff,

v.

William CAMMISANO, Sr., John Sherman Miles, and Michael W. Cuezze, Defendants.

No. 75 CR 52–W–1.

United States District Court,
W. D. Missouri, W. D.

June 9, 1977.

Bert C. Hurn, U.S. Atty., Gary Cornwell, Sp. Atty., Dept. of Justice, Kansas City, Mo., for the United States.

Joel Pelofsky, Kansas City, Mo., for defendant, Cammisano.

James R. Wyrsch, Kansas City, Mo., for defendant, John Miles.

---

Patrick R. Faltico, Kansas City, Mo., for defendant, Michael Cuezze.

JOHN W. OLIVER, Chief Judge.

This case pends on the government's motion to dismiss the indictment, filed pursuant to Rule 48(a), Federal Rules of Criminal Procedure. All three defendants have advised the Court that they have no objection to dismissal in light of the government's express statement in its suggestions in support of its motion to dismiss that it "does not intend to seek re-indictment of these defendants for the violations alleged in this indictment." The government's motion to dismiss will be granted for reasons which will now be stated.

The government's suggestions state that "the Criminal Division of the Department of Justice has authorized the Government to seek a dismissal of the charges, as appropriate, in the interest of justice after having reviewed the charges, pleadings and other matters of record."

The files and records upon which the government bases its motion to dismiss establishes that, consistent with the order of the Court of Appeals in *United States v. Cammisano* (8th Cir. 1976) 546 F.2d 238, 242, the government was afforded an opportunity to submit to this Court for its *in camera* examination the material requested in paragraphs 3 and 4 of the defendants' motion for discovery, which this Court granted for reasons stated in *United States v. Cammisano* (W.D.Mo.1976) 413 F.Supp. 886. The files and records further show that on January 17, 1977, the government produced for our *in camera* examination a mass of data covered by those paragraphs.

After careful examination of that data, this Court filed memorandum opinions and entered orders directing further proceedings on January 27, 1977, on February 4, 1977, on February 17, 1977, and on March 17, 1977. Those orders included provisions which directed that the government produce additional material for this Court's *in camera* examination for the reasons stated in our memorandum opinions.

The orders entered on March 17, 1977 included a direction that in the event the government wished to take the same position in this case that it took in regard to the production ordered in *United States v. Williams* (W.D.Mo.1974) 65 F.R.D. 422, namely, that it would suffer dismissal of the indictment rather than make the production ordered by this Court, that the government should so state and that this Court would dismiss this case in accordance with applicable law.

On March 23, 1977, the government advised the Court that the Appellate Section of the Criminal Division, Department of Justice, requested an additional thirty days within which to respond to this Court's orders entered March 17, 1977, in order to allow the Appellate Section and the Solicitor General's Office to consider what position the government wished to take under the circumstances.

In accordance with the government's March 23 1977, motion, the time for the response of the United States was extended to April 25, 1977. On that day the government filed a response in which it stated that although this Court's orders of March 17, 1977 had been the subject of discussion over a thirty day period with the Appellate Section of the Criminal Division and the Solicitor General's Office, the attorneys assigned the prosecution of this case stated that "[T]he Government does not understand in what respect the Court poses the question of whether 'the Government wishes to take the same position in this case as it took in regard to the production ordered in *United States v. Williams* (W.D. Mo.1974) 65 F.R.D. 422, namely, that it would rather suffer dismissal of this case than to permit the production ordered. . . .'"

Although this Court had some difficulty in understanding why the government did not understand what this Court had stated in paragraph 3(a) of its March 17, 1977 order, we nevertheless directed that a conference be held on April 29, 1977, so that any lack of understanding would be remedied.

Accordingly, a conference with counsel for all parties was held on April 29, 1977. Thereafter, the government's motion for a further extension of time was granted for a period of three weeks from the date the parties would receive copies of the transcript of the April 29, 1977 conference. On May 23, 1977, the government requested and was granted still a further extension until June 2, 1977.

On June 2, 1977, the pending motion to dismiss the indictment was filed and the Court was advised that the government would seek dismissal "in accordance with paragraph 3(c) of this Court's Memorandum and Order of March 17, 1977." That paragraph of our March 17, 1977 order is the paragraph which made reference to the position taken by the government in *United States v. Williams, supra,* and was the paragraph which provided, in substance, that the government state definitively whether it would rather suffer dismissal of this case than permit defense counsel to examine the data which the government had produced under order of Court for this Court's *in camera* examination.

The government states in its suggestions in support of its motion to dismiss that it has made an "executive determination that the prejudice to the Government which would flow from disclosure of previously submitted *in camera* documents to counsel for the defendants outweighs the likely benefits of obtaining convictions for these offenses." The initial memorandum opinion published by this Court over a year ago in 413 F.Supp. 886, and the memoranda opinions written since that time, to which we have made reference (copies of which are attached as an appendix to this opinion), are sufficiently detailed to reveal the general nature of the data which this Court considered during the course of its *in camera* examination of the material produced by the government under orders of this Court and under the orders of the Court of Appeals.

Those opinions sufficiently outline the nature of that data to establish valid grounds to support the executive determination that this case should be dismissed, particularly when such data is viewed in light of the statement made by government counsel at the April 29, 1977, conference that "I will have to admit on the basis of the documents, the case was handled differently from other Agricultural cases" [Tr. 59]. The data which this Court examined *in camera* makes clear why the government does not want to make public revelation of just how differently this case was handled from other Agricultural cases.

The principles of law applicable to Rule 48(a) motions to dismiss have been recently stated by this Court in *United States v. Jennings, Tye, King and McLaury,* No. 76 CR 127–W–1, and in *United States v. Barket,* No. 74 CR 141–W–1. Those principles therefore need not be reiterated in this memorandum opinion. We find and conclude from the factual circumstances with which the Court is familiar that the government's decision to seek dismissal is within the broad range of prosecutorial discretion and that it is not based on arbitrary, capricious, or other impermissible reasons.

We believe that it must be added, however, that had the government grounded its decision to seek dismissal on the alleged ground of its "assessment of the limited resources available to prosecute the case to its conclusion in view of the likelihood of protracted litigation in this particular case," the government's motion to dismiss would not have been granted without further appropriate inquiry. This Court would have wanted to have been advised in regard to how and why the resources available to the United States of America have somehow become limited in regard to the further prosecution of this case, when viewed particularly in light of the amount of taxpayers' money already spent on this litigation, and why the likelihood of protracted litigation may be said to establish a valid ground for the dismissal of any case. It is not necessary to make further inquiry in those regards for the reason that other valid grounds exist which support the government's exercise of discretion under the circumstances.

For the reasons stated, it is

ORDERED (1) that the government's motion to dismiss the indictment should be and the same is hereby granted. It is further

ORDERED (2) that the Clerk file the order of dismissal presented by United States Attorney Bert C. Hurn and Special Attorney Gary Cornwell, which we have this day signed.

## APPENDIX

### MEMORANDUM AND ORDER

The mandate and judgment forwarding the order entered by the Court of Appeals in its Case No. 76–1559 on December 8, 1976, was received and filed by the Clerk of this Court on January 3, 1977. That order remanded the case to this Court for further proceedings consistent with the opinion of the Court of Appeals.

The order of remand was made "in order to give the prosecutor the opportunity to submit to the district court the material requested in paragraphs 3 and 4 of the discovery order." Those paragraphs, quoted in footnote 1 of the Court of Appeals opinion, read as follows:

3. All correspondence, inter-department communications, intra-department communications and referral documents relating to the particular violations alleged in this prosecution which were made, retained and/or transmitted within the Department of Agriculture, within the Department of Justice and between them, together with all reports attached to such documents, correspondence and communications except as have already been provided defendants with notations as to which items have been so provided.

4. All correspondence, inter-department communications, intra-department communications and referral documents together with all supporting documents and reports, relating to any violations of Section 601ff, Title 21, U.S.C. which occurred in the Western District of Missouri during the period January, 1972, to and through December, 1974, and which were made, retained and/or transmitted within the Department of Agriculture within the Department of Justice and between them, whether such correspondence, communications and documents resulted in prosecution or not.

In light of the fact that the next regular criminal docket of this Court will commence February 14, 1977, it is important that further pretrial proceedings in this case be completed before that time. Accordingly, it is

ORDERED that the government, if it cares to do so, shall submit the material in paragraphs 3 and 4 above quoted on or before January 17, 1977.

### MEMORANDUM AND ORDERS DIRECTING FURTHER PROCEEDINGS

#### I.

This case pends on the joint motion of all parties for a continuance of the trial of this case until March 28, 1977.[1] The joint motion will be granted to the extent that the case will be removed from the joint criminal docket presently scheduled to commence on February 14, 1977. For it is apparent that still further pretrial proceedings are necessary in connection with the defendants' alleged defense of selective and discriminatory prosecution.

#### II.

The files and records show that on January 7, 1977, upon receipt of the mandate remanding this case for further proceedings consistent with the opinion of the Court of Appeals, we entered an order affording the government the opportunity to submit the materials requested in paragraphs 3 and 4 of the discovery order involved in this case for our *in camera* examination.

---

1. Defendants filed a motion for additional production on January 21, 1977. That motion will not be ruled until after we have received and considered the government's suggestions which have not yet been filed.

On January 17, 1977, the government presented for our *in camera* examination an unorganized mass of data included in Exhibits "A," "B," "C," "CC," "D," and "E," as described in Mr. Cornwell's letter to the Court dated January 17, 1977. On January 21, 1977, the government transmitted additional data for our *in camera* examination Exhibits "F," "G," and "H," which Mr. Cornwell received from the Department of Agriculture.

Mr. Cornwell's letter of January 21, 1977, however, stated that he has not yet attempted to retrieve from the Department of Justice files, documents which may be similar to the Department of Agriculture documents contained in Exhibits "G" and "H." We shall return to that subject in a later part of this memorandum opinion.

We have carefully examined all of the data submitted and find and conclude that such data can reasonably be said to contain substantial evidence which is relevant and material to the factual issues presented by defendants' alleged defense of selective and discriminatory prosecution. We further find and conclude that defendants are entitled to production of many of the documents produced for our *in camera* examination under the principles stated in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the progeny of that case. Consistent with the rationale of *Dennis v. United States*, 384 U.S. 855, 874–875, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), it is therefore necessary that we make inquiry into whether the government has any objection to permitting defense counsel to examine the data presented for this Court's *in camera* examination.

In the event of the government's refusal to voluntarily permit such an examination, we will then be required to reach the question of whether we should enter an order granting defendants' counsel the right to inspect the data, under an appropriate protective order, for the purpose of further development of the complete factual circumstances as they relate to defendants' alleged defense.

III.

Our *in camera* examination of the data submitted by the government has raised an additional question which must be given appropriate attention. That question involves an apparent factual conflict between the representations made to this Court by the government in the form of two affidavits submitted as Exhibits 5 and 6 at the April 13, 1976 evidentiary hearing and data which has been submitted for our *in camera* examination at this time.

Our recitation of the factual circumstances concerning that question must still, once again, be read and considered in light of the Department of Agriculture's MPI Directive 922.1–922.6. MPI Directive 922.6 sets forth the Department of Agriculture procedures under which cases shall be recommended for prosecution. It provides that:

The Compliance Staff (CS) is responsible for recommending prosecution when evidence of a violation is sufficient to support legal action. Such recommendations are submitted to the Office of the General Counsel who in turn, forwards same to the Department of Justice for appropriate legal action.

The question of whether the Department of Agriculture, in fact, followed MPI Directive 922.6 has been presented from the outset of this case. In our memorandum opinion of March 29, 1976, for reasons fully stated, we concluded that:

It would seem obvious that the problem of determining whether the Guidelines set forth in MPI Directive 922.6 were in fact followed, or whether they were violated in a discriminatory manner, may be determined by an *in camera* inspection of the records and reports made by the Department of Agriculture pursuant to MPI Directive 922.1, issued March 7, 1973, which was also made available to the Court at proceedings held December 10, 1975. [413 F.Supp. 886, 901 (W.D.Mo. 1976)].

In a second memorandum opinion filed May 10, 1976, we again stated that:

MPI Directive 922.6 and the portion of the 1974 Report of the Secretary of Agriculture attached to our memorandum opinion of March 29, 1976, raise the preliminary question of whether the Department of Agriculture's Office of Investigation ever made an appropriate reference to Agriculture's General Counsel, and whether Agriculture's General Counsel ever made an appropriate reference to the Department of Justice. [*Id.* at 895] We added that:

Furthermore, we do not know whether the Department of Justice ever made an appropriate reference to the United States Attorney for the Western District of Missouri. We do not know how or why or at whose direction the "U.S. Attorney, Kansas City," was designated "to immediately receive two copies of Exhibit No. 19." We do not know whether the ten other cases actually prosecuted by the Department of Justice throughout the United States during the year 1973 were handled in the same manner in districts other than the Western District of Missouri. [*Id.* at 895–896].

And in our memorandum opinion of June 2, 1976, dismissing this case, written after a modicum of Department of Agriculture and other data had grudgingly come to light, we expressly concluded that:

Government Exhibits Nos. 19 and 20 raise substantial questions concerning possible irregularities in the manner in which this case was reported by the Department of Agriculture to the Department of Justice for prosecution. Exhibit 19, a cropped version of Exhibit 20 (initially produced only for *in camera* examination), reveals that two copies of the Department of Agriculture's investigation report were sent directly to "U.S.

Attorney, Kansas City," apparently before any reference for prosecution was made by the Department of Agriculture to the Department of Justice. Such a transmittal would appear to be in violation of the Department of Agriculture's own guidelines concerning the processing of violations of the Federal Meat Inspection Act, Department of Agriculture MPI Directive No. 922.6. [*Id.* at 890].[2]

In our June 2, 1976 memorandum opinion we took particular note of the government's erroneous suggestion that we had somehow overlooked a conclusory affidavit made by Glenn D. Bierman, Associate Administrator, Packer and Stockyards Administration, Department of Agriculture, which the government adduced in evidence as Exhibit 5 at the April 13, 1976 evidentiary hearing conducted in this case. We stated in regard to that affidavit that:

If, in fact, the investigation file in connection with this case was forwarded to the Department of Justice for prosecution, consistent with the established procedures and express regulations of the Department of Agriculture, all that would have been necessary to establish the truth of the conclusion stated in the affidavit would have been to attach a copy of the Department of Agriculture's letter of transmittal to the Department of Justice and to assure this Court that such letter had in fact been sent. Certainly the affidavit of Mr. Bierman did not even purport to answer the question of whether the procedures followed in this case were followed in connection with the dozen or so criminal cases prose-

---

2. We further stated in our June 2, 1976 memorandum opinion that:

The mystery of why two copies of an apparently routine Department of Agriculture investigation were forwarded to the "U.S. Attorney, Kansas City," long before consideration by the Office of the General Counsel of the Department of Agriculture, and apparently before any consideration by the Department of Justice in Washington, is, as we have

stated, but one of the circumstances which supports the Court's finding of particularized need for further *in camera* examination of the government's files in connection with the authorization of the prosecution of this case and in connection with the standards applied in connection with the other rare criminal prosecutions for alleged violations of the Federal Meat Inspection Act. [413 F.Supp. at 894]

cuted throughout the United States during each year of the 1970's. [*Id.* at 894].[3]

## IV.

In light of particular data presented for our *in camera* examination to which we will presently make reference, we are required to examine in detail the particular representations made to this Court at the April 13, 1976 hearing in regard to whether the Department of Agriculture in fact followed MPI Directive 922.6, as contained in Exhibit 5, an affidavit of Glenn G. Bierman, and Exhibit 6, an affidavit of Milton L. Goodman. The first two paragraphs of the Bierman affidavit generally outlined the procedures mandated by MPI Directive 922.6 Paragraph 3 of that affidavit, however, represented to this Court that:

> Consistent with the procedures outlined above the investigative file in the subject case, which indicated that the subject defendants willfully violated the said provisions of the Packers and Stockyards Act, was forwarded to the Department of Justice for prosecution.

The first two paragraphs of the Goodman affidavit were in substantially the same form as the first two paragraphs of the Bierman affidavit. The third paragraph of the Goodman affidavit, however, stated that:

> In the subject case the Department of Agriculture recommended felony prosecutions against the subject defendants because the investigative file disclosed that the subject defendants violated the Act with intent to defraud and also distributed or attempted to distribute adulterated carcasses, parts of carcasses, meat, and meat food products from certain "cancer-eye" cattle. In our view, such activities constitute serious violations of the Act which warranted a recommendation of prosecution.

It is clear that the affidavits of Bierman and Goodman were introduced in evidence for the purpose of establishing, as a matter of fact, that the Department of Agriculture had followed the procedures required by MPI Directive 922.6 in connection with this particular case. The apparent conflict between that factual representation and what apparently actually happened in regard to the part played by the Department of Agriculture in connection with the eventual prosecution of this case will be stated in the next part of this memorandum opinion.

## V.

In all of the *in camera* data submitted, we find only one Department of Agriculture Form P&SA 326 which could be said to reflect any recommendation by the Compliance Staff to the Office of the General Counsel that any portion of this case be referred by the Department of Agriculture to the Department of Justice for prosecution. However, that request, dated September 11, 1973, involved only one of the defendants eventually indicted. No document presented for our *in camera* examination reflects what action, if any, the Office of the General Counsel may have taken in regard to that Form P&SA 326 request. Rather, a letter written by the Director of the Compliance Staff on September 13, 1973, to the Director of the Office of the General Counsel recognized that "this case is *now* in the hands of the United States Attorney." That September 13, 1973 letter also reflects that the Department of Agriculture apparently had, at some time prior to the date of that letter, requested prose-

---

**3.** In our June 2, 1976 memorandum, just as we had earlier stated in our May 10, 1976 memorandum, we again noted the factual importance of determining whether this case had been recommended for prosecution in the same manner as other cases in which criminal prosecution was recommended in lieu of a warning letter. In that connection we said:

> If the same procedures were in fact followed in all criminal prosecutions, including

but not limited to the defendants involved in this case, one factual situation would be presented. If not, dependent upon the circumstances, a different factual situation might be presented in regard to defendants' alleged selective and discriminatory prosecution defense. Our order of May 10, 1976 was designed to obtain accurate information in regard to this relevant question of fact. [*Id.* at 894].

cution against six defendants, rather than only two of the three defendants who were eventually indicted. We have not been furnished any document which reflects the procedures under which the Department of Agriculture's requests referred to in the September 13, 1973 letter were made. While the defendant mentioned in the single P&SA Form 326 produced for *in camera* examination was one of the three defendants eventually indicted, no document has been produced which reflects what, if any, action was taken in regard to that single P&SA Form 326.

Apart from the Form P&SA 326 dated September 11, 1973, which related to but one of the defendants eventually indicted, the only document thus far produced by the government which might be said to be a request by the Department of Agriculture to the Department of Justice to prosecute is an air mail, special delivery letter addressed to The Honorable Bert C. Hurn, United States Attorney for this District, dated October 31, 1973.[4] That letter was inaccurately directed to the attention of Mr. Joseph Ciolino as an Assistant United States Attorney for the Western District of Missouri.[5] That letter, of course, was written well over a month after the Director of the Compli-

ance Staff had already advised the Office of the General Counsel of the Department of Agriculture, on September 13, 1973, that "this case is *now* in the hands of the United States Attorney."

The October 31, 1973 letter written to United States Attorney Hurn, the original of which was apparently produced from the files of the Kansas City Field Office of the Organized Crime and Racketeering Section, shows on its face that it was written as a result of a telephone conversation between Special Attorney Ciolino and a Mr. Gessel of the Office of the General Counsel. More important, in regard to whether the Department of Agriculture ever "recommended felony prosecutions against the subject defendants," as represented to this Court in Mr. Goodman's affidavit last April, the October 31, 1973 letter to United States Attorney Hurn shows that the Department of Agriculture, "pursuant to Mr. Ciolino's request," had prepared and enclosed the original and three copies of a proposed information against six defendants "which you may wish to use in the prosecution of this case."

The October 31, 1973 letter to Mr. Hurn, ten pages, single-spaced in length, made detailed reference to the statutes deemed to

4. We recognize that MPI Directive 922.6 provides that the Office of the General Counsel shall forward recommendations for prosecution "to the Department of Justice," rather than to a "United States Attorney." A United States Attorney may, however, be considered as a part of the Department of Justice for certain purposes. And there may be some other departmental directive which has not yet been produced which may authorize the Office of the General Counsel to make a direct forwarding of a recommendation for prosecution to a United States Attorney rather than to the Department of Justice in Washington for its preliminary review.

In order to avoid further delay, we have assumed for present purposes that the Office of the General Counsel may be authorized to forward a recommendation for prosecution directly to a United States Attorney rather than to the Department of Justice in Washington, as apparently contemplated by MPI Directive 922.6. The procedures followed in the small number of cases in which similar prosecutions have been authorized may clarify the construction which both the Department of Agriculture

and the Department of Justice have placed on MPI Directive 922.6.

5. The opening sentence of that letter also erroneously identified Mr. Ciolino as an Assistant United States Attorney for the Western District of Missouri, rather than as a Special Attorney attached to the Field Office of the Organized Crime and Racketeering Section of the Criminal Division of the Department of Justice.

The publicity release prepared by Special Attorney Adams of the Kansas City Field Office of the Organized Crime and Racketeering Section to Washington for national release contained a statement to the effect that "this matter was presented to the Grand Jury by attorneys of the Organized Crime and Racketeering Section of the Department of Justice, under the supervision of U.S. Attorney Bert C. Hurn." We have not been furnished any *in camera* data which would support the notion that the United States Attorney for this District either supervised the presentation of this case to the grand jury or had anything else to do with this prosecution, other than to sign his name to the indictment.

be applicable; discussed the investigative reports in detail; and explained why an information rather than an indictment was proposed by the Department of Agriculture. We do not believe it appropriate to discuss that letter at this time in any greater detail other than to state (1) that it does not in any way support the representation in Mr. Goodman's affidavit that the Department of Agriculture had in fact "recommended felony prosecutions against the subject defendants," or that "the investigative file discloses that the subject defendants violated the Act with intent to defraud," or that the investigative file supported a charge that the defendants had "distributed or attempted to distribute adulterated carcasses, parts of carcasses, meat and meat food products from certain 'cancer-eye' cattle;" and (2) that the letter contained a detailed explanation of why the Department of Agriculture did not believe any charge should be made against one of the defendants who was subsequently indicted.

We believe that it is appropriate to add that the Department of Agriculture's recommended two-count information, enclosed in the October 31, 1973 letter, only two and one-half pages long, proposed in Count I that six defendants, including only two of the three defendants eventually indicted, should be prosecuted for a misdemeanor offense. Count II of that information proposed that two defendants, both of whom were eventually to be indicted, be prosecuted for a separate misdemeanor. One of those defendants was also named in Count I. One of the defendants subsequently indicted was not named in either count of the Department of Agriculture's proposed information. The proposed information made no reference whatever to the slaughter or transportation of any "cancer-eye" cattle.

We believe it is clear from what we have said that there is an apparent conflict between the government's representations to this Court at the April 13, 1976 evidentiary hearing and the circumstances revealed in the *in camera* data in regard to the manner in which MPI Directive 922.6 may have been followed. Appropriate orders will therefore be entered to resolve that apparent conflict.

## VI.

Mr. Cornwell's letter of January 21, 1977, transmitting Exhibits "F", "G," and "H," which he had received from the Department of Agriculture in Washington, suggests that the Department of Agriculture may have included documents which, to use Mr. Cornwell's words, "appear on their face to relate primarily to a possible violation of 18 U.S.C. § 1001, and an investigation to determine whether federal meat inspection should be withdrawn pursuant to Section 401 of the Federal Meat Inspection Act."

Mr. Cornwell's letter suggested that "such materials do not appear to fall within the defendants' discovery" but that he was nevertheless transmitting the documents to the Court because the Department of Agriculture did not object. Mr. Cornwell, however, added that so far as the Department of Justice was concerned, "I did not, however, independently attempt to retrieve similar documents from the Department of Justice."

We find and conclude that the Department of Agriculture properly recognized that the documents it submitted in Exhibits "G" and "H" are directly related and relevant to the questions presented by defendants' alleged defense of selective and discriminatory prosecution.

In regard to the obvious questions of relevancy and materiality presented, when viewed in light of principles stated in *Brady v. Maryland, supra,* and *Dennis v. United States, supra,* we have carefully reviewed all of the data submitted for our *in camera* examination and have prepared in draft form an analysis of that data and the reasons why the particular data produced by the Department of Agriculture in Exhibits "G" and "H" was relevant and material under the circumstances.

It is quite apparent, of course, that some of the data produced by the Department of Agriculture in Exhibits "G" and "H" had already been produced in the other exhibits presented for our *in camera* examination.

The data contained in Exhibits "G" and "H," of course, are more complete.

But apart from the duplication of subject matter presented, we have concluded that the guidelines relating to *in camera* inspection of evidence referred to in *United States v. Nixon*, 418 U.S. 683, 714–715, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), suggest that we withhold publication of our detailed analysis of the data and our findings in regard to its relevancy and materiality until it is determined whether the government will accept our ruling and indicates whether it will produce from the files of the Department of Justice all files similar to those which the Department of Agriculture has already produced in Exhibits "G" and "H." An appropriate order will be entered which will permit the government to state its position in regard to this question.

## VII.

For the reasons stated, it is

ORDERED (1) that the joint motion of all parties for a continuance of the trial of this case should be and the same is hereby granted to the extent above stated. It is further

ORDERED (2) that on or before February 15, 1977, the government shall prepare, serve, and file, as a separate document, an appropriate statement in regard to whether it has any objection to permitting defense counsel, under an appropriate protective order, to examine the data thus far presented for this Court's *in camera* examination.

The government's response shall also include a statement in regard to whether it will comply with an order of this Court granting defendants' counsel the right to inspect such data under an appropriate protective order. It is further

ORDERED (3) that on or before February 15, 1977, the government shall submit for our *in camera* examination any and all underlying factual data to support the representations made to this Court at the April 13, 1976 evidentiary hearing in the Bierman affidavit in regard to:

(a) How the Department of Agriculture's investigative file in this case indicated that all of the defendants in this case willfully violated the provisions of the Packers and Stockyards Act; and

(b) How, by whom, and to whom the Department of Agriculture's investigative file was forwarded to the Department of Justice for prosecution consistent with the procedures outlined in the first two paragraphs of Mr. Bierman's affidavit. An index of the documents presented shall be served on counsel for the defendants and filed with the Clerk. It is further

ORDERED (4) that on or before February 15, 1977, the government shall submit for our *in camera* examination any and all underlying factual data to support the representations made to this Court at the April 13, 1976 evidentiary hearing in the Goodman affidavit in regard to:

(a) When, by whom, and to whom the Department of Agriculture recommended felony prosecutions against all of the defendants in this case; and it shall

(b) Designate the particular portions of any Department of Agriculture investigative file which disclosed that all defendants in this case may have violated the Act with intent to defraud; and

(c) Designate any portions of any Department of Agriculture investigative file which disclosed that the defendants in this case distributed or attempted to distribute adulterated carcasses, parts of carcasses, meat and meat food products from certain "cancer-eye" cattle.

An index of the documents presented shall be served on counsel for the defendants and filed with the Clerk.

It is further

ORDERED (5) that on or before February 15, 1977, the government shall prepare, serve, and file, as a separate document, an appropriate statement in regard to whether it will produce all Department of Justice documents wherever they may be located, including but not limited to Kansas City and Washington, which are similar to the documents produced by the Department of Agriculture, as contained in Exhibits "G"

and "H" of this data submitted for our *in camera* examination.

Kansas City, Missouri

January 27, 1977

### MEMORANDUM AND ORDER

This case now pends on defendants' motion for production filed January 21, 1977. That motion substantially narrowed the scope of paragraph 5 of defendants' original motion for production, which became paragraph 5 of this Court's discovery order. Defendants' pending motion makes clear that the production sought is confined to alleged violations which resulted in prosecution in 1974.[1] On January 28, 1977, the government filed a response to defendants' pending motion in which we were advised that "the government has requested the tape recording of the oral argument before the Eighth Circuit Court of Appeals to determine what precisely was said during that argument." The government's response requested that the government be granted until February 15, 1977 to respond to defendants' pending motion, pointing out that February 15, 1977 is the date on which the government is required to comply with various orders entered on January 27, 1977.

While we will grant the government's request for an extension of time, we believe it appropriate that we state that we do so for reasons other than being advised of what may have been said in oral argument before the Court of Appeals. For we are under duty, by reason of the Court of Appeals order of remand, to conduct further timely proceedings consistent with the opinion of the Court of Appeals.

The Court of Appeals remanded this case to this Court on the sole ground that it concluded that "the production order was overbroad" [546 F.2d p. 240]. The Court of Appeals expressly rejected the government's alternative argument that "the appellees completely failed to show 'colorable basis' for their selective prosecution claim, and that the documents already produced refute the appellees' claims." [P. 241].[2]

In rejecting the government's primary argument on the merits, the Court of Appeals concluded that "On this record, we cannot say that the issuance of the further discovery order for *in camera* inspection, exceeded the broad discretionary powers vested in a federal trial judge". [P. 242].[3]

The government's response to defendants' pending motion does no more than make clear that government counsel who presented the appeal to the Court of Appeals did not, to use Chief Justice Burger's language from *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971), carry "the burden of 'letting the [government's] left hand know what the [government's] right hand is doing' or has done." We believe it appropriate to state at this time that defendants' pending motion for production may not properly be determined on the basis of what counsel for either party may have said in their oral arguments before the Court of Appeals. The government may of course, under prin-

---

1. The Court of Appeals opinion recognized that "The government did not present the overbreadth issue to the district court." The files and records in this Court establish that had the government presented any overbreadth question to this Court, rather than waiting to raise such a question in the Court of Appeals, this Court would have promptly modified the apparent breadth of paragraph 5 of the discovery order so that it would clearly reflect on its face that the government's discovery would be limited to violations which resulted in actual prosecution. For it is clear that no one ever suggested, or even intimated, when the case pended in this Court that paragraph 5 of the defendants' discovery motion, which eventually became paragraph 5 of the discovery order, was to be read to seek or require production in regard to any alleged violations other than those which had resulted in actual prosecution.

2. On p. 240 of 546 F.2d the Court of Appeals also rejected the government's argument that "the appellees' allegations are insufficient to warrant production of the other requested documents because the appellees failed to make a colorable claim of selective prosecution."

3. The Court of Appeals stated and concluded that "we essentially agree with the district court's reasoning" and made clear that the case was remanded to this Court only "because of the overbreadth of the production order." [P. 240].

ciples stated by Chief Justice Burger in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), now be foreclosed from taking any position in regard to production contrary to that which was taken by other government counsel before the Court of Appeals. Apart from that possible circumstance, we do not believe that what may have been said in oral argument in the Court of Appeals can have any impact upon the proceedings which must be conducted pursuant to the Court of Appeals order of remand.

The Court of Appeals order of remand requires that we conduct further timely proceedings consistent with the Court of Appeals opinion. Nothing was said or even intimated in the opinion of the Court of Appeals that can reasonably be said to suggest that the further proceedings to be conducted in this case are to be limited to our *in camera* examination of the data identified in paragraphs 3 and 4 of the discovery order. Our memorandum opinion and orders of January 27, 1977 show that our *in camera* examination of that data has introduced additional substantial questions of fact which were not presented before that examination was conducted.

We do not believe it necessary to reiterate what we stated in our memorandum opinion of January 27, 1977 in regard to the relevancy and materiality of ascertaining whether the procedures followed in connection with the authorization of the pending prosecution were the same procedures which the government may have followed in connection with the handful of cases apparently referred to the Department of Justice by the Department of Agriculture with a recommendation for prosecution in accordance with MPI Directive 922.6. We believe it is sufficient to state that our view of the question of the relevancy and materiality of that data was clearly before the Court of Appeals as it reviewed the various memoranda opinions handed down by this Court on March 29, 1976, May 10, 1976, and June 2, 1976.[4]

The Court of Appeals opinion shows that it accepted the government's appellate counsel's reading of paragraph 5 of our discovery order and concluded that such paragraph was overbroad in that it should be read as requiring the government "to undertake a burdensome collection and production of documentation of certain activities of the Department of Agriculture throughout the country." [P. 242]. The defendants' pending motion obviously is designed to eliminate any possible overbreadth issue from this case.

The government will therefore understand that its request for an extension of time is granted for reasons other than to permit the Special Attorneys in the Kansas City Field Office of the Organized Crime and Racketeering Section to find out what other government counsel may have stated to the Court of Appeals in oral argument in connection with an issue which was not presented to this Court. The government's response to the defendants' pending motion when filed on February 15, 1977 shall therefore address itself to the merits of the question whether the government believes that data relating to alleged violations which resulted in prosecutions in 1974 are relevant and material to the defendants' alleged defense of selective and discriminatory prosecution, and shall state whether the government will produce such data for this Court's *in camera* examination under the circumstances.

Should the government find out from its review of the oral argument before the Court of Appeals that it has already conceded, as defendants suggest, that the production of the data relating to the 14 cases prosecuted in 1974 would not be burdensome, we suggest that the government give appropriate consideration to whether the data called for in defendants' pending mo-

---

4. See part III of our memorandum opinion of January 27, 1977 and the footnotes to that part of that memorandum opinion, in which attention is again directed to what this Court has stated in those earlier orders in connection with the necessity of obtaining accurate information concerning the circumstances under which MPI Directive 922.6 may or may not have been followed in this and the few other cases which were actually prosecuted.

tion be produced on February 15, 1977 for our *in camera* examination in order that further expenditure of time be avoided.

For the reasons stated, it is

ORDERED (1) that the government's response to the defendants' motion for production, filed January 28, 1977, should be and the same is hereby treated as an application for an extension of time and, as so considered, should be and the same is hereby granted. It is further

ORDERED (2) that the government's response to the defendants' motion for production filed January 21, 1977 shall be filed on or before February 15, 1977, in accordance with what we have stated above.

Kansas City, Missouri

February 4, 1977

### MEMORANDUM AND ORDERS

On February 15, 1977, the government filed various responses to orders entered January 27, 1977 and February 4, 1977. The orders entered on February 4, 1977 related solely to defendants' pending joint motion for production filed January 21, 1977.

A portion of the government's filing captioned "Government's Response to Requests for Additional *In Camera* Production" relates to that motion. Another portion of that filing relates to other matters which will be discussed in part II of this memorandum opinion. A separate question raised by the government's response to items Nos. 3 and 4 of the orders entered January 27, 1977, which was filed *in camera,* will be discussed in part III of this memorandum opinion.

### I.

Although the government's response to the pending joint motion for production suggests that production of the documents identified in that motion would be "burdensome," it does not attempt to substantiate that conclusory assertion. Rather, the government states that it "will attempt to produce such documents as soon as they may reasonably be gathered, if the Court so requests."

The government's response also states that it "would ask the Court to advise us whether review of all documents sought by the defendants is deemed by the Court to be necessary, for it appears that the materials within the APHIS files can be gathered within possibly ten days, whereas production of related documents now scattered throughout the country in Justice Department files will obviously require considerably longer."

With respect to the government's request for advice on whether review of all documents is necessary, we reiterate our earlier and consistent findings and conclusions as they appear in memoranda opinions handed down on March 29, 1976, May 10, 1976, and June 2, 1976, regarding the relevancy and materiality of data relating to prosecutions. In short, we again find and conclude that it is necessary that we review all documents identified in defendants' pending joint motion for production.

### II.

The government's response to requests for additional *in camera* production, filed February 15, 1977, suggests that some sort of new discovery request has been "advanced in this litigation." It is suggested that a "discovery request" has been made for internal documents from the Department of Justice files relating to a possible violation of 18 U.S.C. § 1001 and an investigation to determine whether federal meat inspection should be withdrawn from a company which is not a party to this case.

On January 27, 1977, we entered an order which provided:

ORDERED (5) that on or before February 15, 1977 the government shall prepare, serve, and file, as a separate document, an appropriate statement in regard to whether it will produce all Department of Justice documents wherever they may be located, including but not limited to Kansas City and Washington, which are similar to the documents produced by the Department of Agriculture, as contained

in Exhibits "G" and "H" of this data submitted for our *in camera* examination.

In part VI of our memorandum opinion filed that day, we discussed data produced by the Department of Agriculture as contained in Exhibits "G" and "H" which had been submitted for our *in camera* inspection. We stated our finding and conclusion that, contrary to the statement contained in Mr. Cornwell's letter of January 21, 1977, the documents contained in Exhibits "G" and "H" were directly related and relevant to the questions presented by defendants' alleged defense of selective and discriminatory prosecution. We accordingly entered the above quoted order to afford the government an opportunity to state whether or not it would produce like data from the Department of Justice files.

In connection with the matter under discussion, the government states that "we will attempt to produce the materials for the Court's *in camera* inspection as soon as possible." In light of that statement, it is not necessary to make any further order under the circumstances. We accept that statement as a compliance with the order above quoted even though it was not made in a separate document as ordered on January 27, 1977.

### III.

The government's response to items Nos. 3 and 4 of the orders entered January 27, 1977, which was filed *in camera,* suggests for the first time during the long history of this litigation that MPI Directive No. 922.6 is not applicable to the Packers and Stockyards Administration and that such "directive is applicable only to the Animal and Plant Health Inspection Service, a separate agency within the Department of Agriculture." Why this information has been withheld from the Court until this late date is unexplained.

Under the circumstances, it is necessary that the government be ordered to produce for our *in camera* inspection the regulations or directives under which prosecutions for the offenses contained in the pending indictment are referred to the Department of Justice by the Department of Agriculture.

### IV.

For the reasons stated, it is

ORDERED (1) that defendants' pending joint motion for production filed January 21, 1977 should be and the same is hereby granted.

The government shall make the production called for in that motion and the additional production which it stated it would make as discussed in part II of the government's response to requests for additional *in camera* production filed February 15, 1977, as soon as such production can be conveniently made. It is further

ORDERED (2) that the government shall make *in camera* production of any and all regulations and directives within either the Department of Justice or the Department of Agriculture under which recommendations for prosecution of the offenses covered by the pending indictment are required to be made. Such production shall be made as promptly as possible.

Kansas City, Missouri

February 17, 1977

### MEMORANDUM AND ORDERS GRANTING MOTIONS TO PRODUCE

### I.

In our memorandum opinion dated January 27, 1977, we made the following factual findings and stated the following legal conclusions in regard to the data submitted for our *in camera* examination as identified in Mr. Cornwell's letter to the Court dated January 17, 1977:

We have carefully examined all of the data submitted and find and conclude that such data can reasonably be said to contain substantial evidence which is relevant and material to the factual issues presented by defendants' alleged defense of selective and discriminatory prosecution. We further find and conclude that defendants are entitled to production of many of the documents produced for our

in camera examination under the principles stated in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the progeny of that case. Consistent with the rationale of *Dennis v. United States,* 384 U.S. 855, 874–875, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), it is therefore necessary that we make inquiry into whether the government has any objection to permitting defense counsel to examine the data presented for this Court's in camera examination.

We entered the following order on that day which stated:

ORDERED (2) that on or before February 15, 1977, the government shall prepare, serve, and file, as a separate document, an appropriate statement in regard to whether it has any objection to permitting defense counsel, under an appropriate protective order, to examine the data thus far presented for this Court's in camera examination.

The findings of fact and conclusions of law above quoted were based upon our careful in camera examination of the unorganized mass of data produced for our in camera examination by the government on January 17, 1977. The inquiry stated in the above quoted order was made in order to afford the government the opportunity to indicate whether it would voluntarily recognize and take action consistent with the principles stated in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Dennis v. United States,* 384 U.S. 855, 874–875, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966).

*Brady v. Maryland,* after appropriate discussion of *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935); *Pyle v. Kansas,* 317 U.S. 213, 215–216, 63 S.Ct. 177, 87 L.Ed. 214 (1942), and other applicable cases, definitively held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Dennis v. United States* concluded that it is not realistic to assume that

the trial court's judgment as to the use of material which it has concluded after in camera examination should be produced, disposes of the matter of production. That case held that it was not the duty or function of the trial judge to pick and choose what portions of data which it has concluded should be produced should be turned over to defendant's counsel for their use in further proceedings in a criminal case, holding that "in our adversary system, it is enough for judges to judge." That court added that:

The determination of what may be useful to the defense can properly and effectively be made only by an advocate. The trial judge's function in this respect is limited to deciding whether a case has been made for production, and to supervise the process.

On February 15, 1977, the government filed a response in regard to the order above quoted in which it stated that it did object to "any further discovery of the data, directly or indirectly, to the defendants." For reasons which were neither stated nor apparent, the government added that "it is unable to advise the Court of its position on such an order until such time, if any, as the Court may deem it necessary to overrule the government's objection to disclosure, and promulgate such an order." At the time the government filed that statement, we had already made the findings of fact and stated the legal conclusions quoted at the outset of this memorandum opinion.

II.

In Part III of our memorandum opinion filed February 17, 1977, we were required to discuss the government's in camera response to items 3 and 4 of the orders entered January 27, 1977. Those orders required the government to submit for our in camera examination any and all underlying factual data to support representations made to this Court at the April 13, 1976 evidentiary hearing in affidavits filed by Glenn D. Bierman and Milton L. Goodman, officials with the Department of Agriculture. Specifically, the government was re-

quired to make *in camera* production of "any and all regulations and directives within either the Department of Justice or the Department of Agriculture under which recommendations for prosecution of the offenses covered by the pending indictment are required to be made."

On March 7, 1977, in response to outstanding orders, the government produced Exhibits I, J, K, L, M, N, O, P, Q, R, S, T, U, V, W, X, and Y, as identified in the letter of Special Attorney Cornwell to the Court on that date. Exhibit Y contains data in apparent compliance with the orders which required production of all Department of Justice or Department of Agriculture regulations and directives. Only Department of Agriculture regulations have been produced. The Department of Justice apparently has no regulations relating to the prosecution of the offenses covered by the pending indictment.

### III.

Our *in camera* examination of all of the exhibits produced on March 7, 1977, establishes that there is a great deal of corroborative and cumulative evidence to support the findings and conclusions which we made in regard to the data originally produced for our *in camera* examination as stated in our memorandum opinion of January 27, 1977. We independently make the same findings and state the same conclusions in regard to the second production made by the government on March 7, 1977, for our *in camera* examination.

We have heretofore discussed in connection with the first *in camera* production, the fact that the Department of Justice recognized, in a letter written by the Director of the Compliance Staff on September 13, 1973, to the Director of the Office of the General Counsel of the Department of Agriculture, that "this case is now in the hands of the United States Attorney."

While there is no evidence to support the statement that the case was in the hands of the "United States Attorney," there is a great deal of evidence to support a finding that the case was in fact in the hands of

and under the direction of the Special Attorneys in the Kansas City Field Office of the Organized Crime and Racketeering Section of the Criminal Division of the Department of Justice. Indeed, it is clear that particular Special Attorneys were in control of the investigation for a substantial period of time before Mr. Carter, Director of the Regulatory Division of the Office of the General Counsel of the Department of Agriculture, on October 31, 1973, sent an air mail, special delivery letter addressed to "Honorable Bert C. Hurn, United States Attorney, Attention: Mr. Joe Ciolino, Assistant United States Attorney." That letter shows on its face that it was written pursuant to a telephone conversation that one Joe Ciolino, who was in fact a Special Attorney, but who was erroneously identified in Mr. Carter's October 31, 1973 letter as an Assistant United States Attorney, had on September 10, 1973 with a Mr. Gessel of the Office of the General Counsel of the Department of Agriculture.

Examination of the Department of Agriculture files produced on March 7, 1977, in regard to cases actually prosecuted and terminated in the year 1974, as that date is contained in Exhibits K, L, M, N, O, P, Q, R, S, T, U, V, W, and X establishes that, without exception, the transmittal of every file from the Department of Agriculture which recommended prosecution was addressed solely to the regularly appointed and duly qualified United States Attorney of the District in which the offense occurred. None of those letters recommending prosecution were addressed to the attention of any Assistant United States Attorney. And certainly none of those letters were written pursuant to the request of some Special Attorney who was erroneously identified in the correspondence as an Assistant United States Attorney. In no instance was any file directed to the attention of anyone except the regularly appointed and duly qualified United States Attorney, the only official named in any of the Department of Agriculture regulations and directives produced on March 7, 1977 for our *in camera* examination as contained in Exhibit Y.

The questions presented by defendants' alleged defense of selective and discriminatory prosecution are not the same questions that were presented in *United States v. Wrigley* (8th Cir. 1975) 520 F.2d 362; *United States v. Agrusa* (8th Cir. 1975) 520 F.2d 370; and *DiGirlomo v. United States* (8th Cir. 1975) 520 F.2d 372. Those cases presented the question of the authority of a Special Attorney to appear before a grand jury. Those cases did not, as illustrated by *Wrigley*, involve cases in which the defendant contended that "the actions of the special attorneys caused him demonstrated prejudice [or] deprivation of a constitutional right."

Defendants' alleged defense of selective and discriminatory prosecution in this case presents questions which are obviously broader than the narrow question of authority presented in *Wrigley, Agrusa,* and *DiGirlomo*. Defendants in this case raise questions not only in regard to the actions of the Special Attorneys and others within the Department of Justice who controlled the prosecution of this case, defendants also raise questions in regard to the manner in which persons within the Department of Agriculture handled the investigation and prosecution of the case.

The fact that the transmittal of the Department of Agriculture's recommendation for prosecution was apparently handled differently in this case than the manner similar prosecutions were recommended to duly appointed and qualified United States Attorneys in all other cases prosecuted throughout the country in 1974 is relevant and material to defendants' alleged defense of selective and discriminatory prosecution. The fact that the Department of Agriculture's recommendation in this case was made at the request of and directed to the attention of a Special Attorney rather than to the United States Attorney alone is equally relevant and material. For the Department of Agriculture's directives and regulations, produced for our *in camera* examination on March 7, 1977, do not authorize the transmittal of a recommendation for prosecution to anyone other than the regularly appointed and duly qualified United States Attorney.

The data produced for our *in camera* examination on March 7, 1977, reveals other circumstances which are relevant and material to defendants' alleged defense of selective and discriminatory prosecution. That data, for example, apparently establishes that the Department of Agriculture did not protest here, as it did in other cases, against an apparent refusal of the persons within the Department of Justice who handled the prosecution of this case to follow the recommendations contained in Mr. Carter's air mail, special delivery letter of October 31, 1973, and as contained in the draft of the two count information transmitted therewith. That letter recommended that six defendants, a corporation and five individuals, be prosecuted for misdemeanor violations as contained in the two count information enclosed therein. Mr. Carter's letter of October 31, 1973, stated why all six of those proposed defendants should be included in the information and also stated why defendant Cuezze, who was subsequently indicted for a felony offense, had not been recommended for prosecution and included in the proposed information.

Some person or persons, not yet identified in the data thus far submitted for *in camera* examination, or otherwise, apparently made the decision that the government should proceed by way of indictment for alleged felony offenses against a different set of defendants, rather than follow the recommendations of the Department of Agriculture as contained in the Department of Agriculture's proposed information transmitted in Mr. Carter's October 31, 1973 letter.

Data contained in Exhibit V, produced March 7, 1977, which related to a prosecution against a corporate and two individual defendants in the Northern District of California, reflects that the Department of Agriculture refused to agree with a request of defense counsel in that case, transmitted by a duly appointed and qualified Assistant United States Attorney of that judicial district, that all charges be dropped in regard

to a particular defendants who apparently occupied substantially the same position in regard to an alleged violation of the Meat Inspection Act as particular persons whom the Department of Agriculture recommended for prosecution for misdemeanor offenses in the pending case but who were never, in fact, named in the indictment eventually obtained in this case.

In rejecting the request that the Department of Agriculture's recommendations not be followed in the case eventually filed in the Northern District of California, Mr. Carter advised the duly appointed and qualified United States Attorney in that district as follows:

This Department has followed a long and consistent course of seeking prosecution of both corporations and their responsible officials in similar cases. The purpose has been to impose the duty of responsibility for compliance with this Act where it ultimately belongs, with the corporate entity and with its responsible officials. While a corporation is a separate legal entity, it obviously cannot act except through persons. Because of the inherent dangers in the food industry, Congress has taken the extraordinary measure of holding merely negligent persons criminally liable for corporate violations when they are in a position of responsibility. The Supreme Court has affirmed this decision in the *Dotterweich* case cited in our transmittal letter. [Defendant's] counsel even recognizes this proposition in his letter. Therefore, administrative officials of this Department feel that prosecution of [the defendant] is not only justified, but necessary in this matter.

The fact that the Department of Agriculture apparently acquiesced in a violation of a "long and consistent course of seeking prosecution" in connection with the pending prosecution is relevant and material to the defendants' alleged defense of selective and discriminatory prosecution.

## IV.

The data contained in each of the exhibits relating to actual prosecutions throughout the country in 1974, produced for our *in camera* examination on March 7, 1977, establishes that, without exception, the proposed informations transmitted in the letters recommending prosecution from the Office of the General Counsel of the Department of Agriculture to the regularly appointed and duly qualified United States Attorneys in the various judicial districts involved were filed in exactly the form recommended and against all and only those defendants recommended for prosecution by the Department of Agriculture. Convictions in each case were obtained on pleas of guilty or nolo contendere. Fines rather than sentences to custody were imposed in each case.

The consistent pattern of prosecution established by all those cases, of course, is directly contrary to what happened to the misdemeanor prosecution recommended by the Department of Agriculture in the pending case against one corporate and five individual defendants. Neither the corporate defendant nor three of the individual defendants were ever prosecuted. The recommended misdemeanor prosecution against defendant Cammisano and defendant Miles was converted into a felony prosecution and a Title 18, United States Code, Section 371 conspiracy count was added. Defendant Cuezze, who was not recommended for prosecution by the Department of Agriculture, was nevertheless indicted for alleged felony offenses in the multi-count indictment eventually obtained in this case.

We find and conclude that that circumstance, for which the government has yet to offer any explanation, is relevant and material to defendants' alleged defense of selective and discriminatory prosecution. In making that finding and in stating that conclusion, we have carefully considered the quite conclusory affidavit of Thomas O. Gessel, Attorney, APHIS Division of the Office of the General Counsel of the Department of Agriculture, dated February 10, 1977, attached to the government's response to items Nos. 3 and 4 of the order

entered by this Court on January 27, 1977, and filed for our *in camera* examination on February 15, 1977.

Mr. Gessel's affidavit makes reference to a conference in Washington on October 31, 1974, exactly one year after Mr. Carter wrote his special delivery, air mail letter of October 31, 1973 to the United States Attorney for this District, attention Joe Ciolino, inaccurately identified as an Assistant United States Attorney, rather than as a Special Attorney. Mr. Gessel's affidavit states that he conferred with Mr. Ronald Cipolla of the Office of General Counsel, with Special Attorney Philip Adams, and with Special Attorney David Helfrey, "to discuss what charges should be presented for consideration to a federal grand jury concerning defendants in the subject case."

What facts Special Attorney Adams may have "explained" to Mr. Cipolla and Mr. Gessel of the Department of Agriculture, upon which Mr. Cipolla and Mr. Gessel allegedly "recommended on behalf of the Department of Agriculture to Mr. Adams that an indictment containing such charges be presented for consideration to a federal grand jury," are not stated in any detail. Nor does Mr. Gessel's affidavit or any other data thus far presented for our *in camera* examination purport to contain any explanation of how, under Department of Agriculture directives and regulations, Mr. Cipolla and Mr. Gessel, rather than Mr. Carter, could speak for the Department of Agriculture.

Even if it is assumed that Mr. Cipolla and Mr. Gessel were authorized to speak for the Department of Agriculture, Mr. Gessel's affidavit does not attempt to state why the Department of Agriculture was agreeable to a prosecution which refused to follow that Department's "long and consistent course" of prosecution and which rejected the prosecution recommended in the Department of Agriculture's proposed information which had been transmitted in Mr. Carter's letter of October 31, 1973, exactly one year before Special Attorney Adams and Special Attorney Helfrey conferred with Mr. Cipolla and Mr. Gessel in Wash-

ington. We think it obvious that Mr. Gessel's affidavit raises more questions than it answers and that those answers cannot be obtained without a further evidentiary hearing.

### V.

*Dennis v. United States, supra,* teaches that the trial judge is not to pick and choose data produced for his *in camera* examination which he believes may be useful to the defense. Rather, as that case concluded, "the determination of what may be useful to the defense can properly and effectively be made only by an advocate" and "the trial judge's function in this respect is limited to deciding whether a case has been made for production, and to supervise the process."

The files and records in this case establish that the government has not given appropriate recognition to its duty to produce evidence favorable to an accused upon request in regard to evidence which we have found to be relevant and material to the alleged defense of selective and discriminatory prosecution, as defined and required by *Brady v. Maryland* and its progeny.

We believe that it is clear that any conviction which may be obtained in this case without permitting defense counsel to determine what may be useful to the alleged defense of selective and discriminatory prosecution would be in violation of the due process guaranteed by the Constitution.

The government has not accepted the opportunity heretofore afforded it to make voluntary production to defense counsel so that a second unseemly confrontation between two independent branches of the government may be avoided. The conversion of a Department of Agriculture recommended two count misdemeanor prosecution for apparent violations of the Meat Inspection Act to a multi-count conspiracy felony prosecution by way of indictment, added to the consistently uncooperative attitude of the government in regard to making prompt production, as required by law, even for this Court's *in camera* examination, as required by *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039

(1974), has already resulted in the expenditure of more governmental resources than all of the other Meat Inspection Act prosecutions during the year 1974 throughout the entire federal system, as disclosed by the exhibits reluctantly produced by the government on March 7, 1977. See and compare *United States v. Steele* (9th Cir. 1972) 461 F.2d 1148 at 1151, in which the Ninth Circuit commented that both that court and the trial court had been "hampered by the government's refusal to supply data on the number of like offenses."

## VI.

While the Court of Appeals, 546 F.2d 238 expressly agreed with the reasoning of this Court, as stated in *United States v. Cammisano* (W.D.Mo.1976) 413 F.Supp. 886, 894 and 897 (App. A. and B.), see page 240 of the Court of Appeals opinion in this case, and while the Court of Appeals quoted with apparent approval our conclusion stated on pages 890–891 of 413 F.Supp., that "*in camera* production of some additional relevant evidence might be sufficient to shift the burden of going forward with proof of non-discrimination on the government," we do not make such a finding or state such a conclusion at this stage of the case. Our citation and reliance upon *United States v. Falk* (7th Cir. 1973) 479 F.2d 616, at 624, shows that we then recognized that at some point a defendant may adduce sufficient evidence which would establish a *prima facie* case of selective and discriminatory prosecution which would shift the burden of going forward with proof of non-discrimination to the government. We do not think it either proper or necessary to focus on or to decide that question at this time. We believe that the proper time for the decision of that question should be after all of the factual circumstances are fully explored at a plenary evidentiary hearing at which all of the relevant and material factual circumstances may be fully developed by something more than documentary evidence.

We accordingly make clear that the orders entered at this time are not based on any finding or conclusion that the data thus far produced for our *in camera* examination has established a *prima facie* case of selective and discriminatory prosecution. We further state that we have not formed even a tentative conclusion in regard to the manner in which the defendants' pending motions to dismiss on the ground of selective and discriminatory prosecution should be ruled on the merits. The orders we now enter are based on the quite narrow ground that our examination of the data produced for our *in camera* examination is of sufficient weight and quantum to require an order directing that defendants' counsel have a right to examine that data and make such use of it as they deem proper in any plenary evidentiary hearing which they deem may be appropriate and for which they may file an appropriate motion after they have completed their examination of the data.

It is therefore appropriate that defendants' pending motions for production be granted and appropriate orders be entered under which defense counsel may be afforded an opportunity to examine all data thus far produced for this Court's *in camera* examination under a proper protective order, in order that further proceedings may be taken in connection with this long-pending case.

For the reasons stated, it is

ORDERED (1) that all of defendants' pending motions for production should be and are hereby granted. An appropriate order will be entered under which counsel for each defendant will be permitted to examine all data thus far produced for this Court's *in camera* inspection in accordance with procedures we now direct. It is further

ORDERED (2) that consistent with this Court's established practice in similar cases, the order to be entered will permit the government to definitively state its position and afford it the opportunity to seek appropriate appellate review of this Court's order, before counsel for any of the defendants will be permitted to examine any of the data heretofore produced for this Court's *in camera* examination. It is, therefore, further

ORDERED (3) that on or before March 25, 1977, the government shall prepare, serve, and file an appropriate response to this order in which it shall definitively state in separately numbered paragraphs:

(a) Whether it has any objection to the entry of an appropriate protective order which will permit counsel for each of the defendants to examine all of the data heretofore produced for this Court's *in camera* examination;

(b) In the event the government has no objection, it shall prepare, serve, and file a form of protective order, under which counsel for defendants will be permitted to examine all of the data filed for our *in camera* examination and which may provide that counsel for defendants shall not make any further disclosure without any further order of Court;

(c) In the event the government wishes to take the same position in this case as it took in regard to the production ordered in *United States v. Williams* (W.D.Mo. 1974) 65 F.R.D. 422, namely, that it would rather suffer dismissal of this case than to permit the production ordered, it shall so state and this Court will dismiss this case in accordance with applicable law;

(d) In the event the government determines that it will permit counsel for defendants the right to examine all *in camera* data heretofore produced under an appropriate protective order, provided it is offered an opportunity to seek appropriate appellate review before such an order is executed, the government shall so state and this Court will stay the execution of its final order of production for a reasonable period of time within which the government may seek appropriate appellate review under the circumstances.

It is further

ORDERED (4) that if the government needs additional time within which to determine its position, a reasonable extension will be granted if sought before the expiration of the time above provided.

Kansas City, Missouri

March 16, 1977